112 T.C. No. 4


UNITED STATES TAX COURT


ESTATE OF HARRIETT R. MELLINGER, DECEASED,
HUGH V. HUNTER AND WELLS FARGO BANK, CO-EXECUTORS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6663-97.                    Filed January 26, 1999.


        P died owning 2,460,580 shares of stock that were
held in her revocable trust.  The stock was included in
her estate pursuant to sec. 2033, I.R.C.  Also included
in her estate, pursuant to sec. 2044, I.R.C., were
2,460,580 shares of the same stock held in a QTIP trust
established by decedent's predeceased spouse.  <u>Held</u>:
The shares of stock should not merge or be aggregated
for Federal estate tax valuation purposes.



<u>Robert B. Martin, Jr.</u>, for petitioner.

<u>Donna F. Herbert</u> and <u>Mark A. Weiner</u>, for respondent.

COHEN, <u>Chief Judge</u>:  Respondent determined a deficiency of $10,574,983 in the Federal estate tax of the estate of Harriett R. Mellinger (decedent).  After concessions by the parties, the issues remaining for decision are:

(1) Whether section 2044 requires aggregation, for valuation purposes, of the stock held in a trust established by decedent's predeceased spouse under section 2056(b)(7) with stock held in decedent's revocable trust and with stock held outright by decedent; and

(2) if section 2044 does not require aggregation, the fair market value of the stock at decedent's death.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference.  Decedent died testate on April 18, 1993 (the valuation date), a resident of Los Angeles, California.  Decedent was the widow of Frederick N. Mellinger (Mr. Mellinger), founder of Frederick's of Hollywood, Inc. (FOH).

## Stock Ownership and Valuations

Prior to Mr. Mellinger's death, decedent and Mr. Mellinger were husband and wife and owned as community property 4,921,160 shares of the common stock of FOH. Such shares were held under the terms of a revocable inter vivos trust known as the Frederick N. Mellinger Family Trust (the family trust).

On the death of Mr. Mellinger, under the terms of the family trust, Mr. Mellinger left his community property interest of 2,460,580 shares of FOH stock in an irrevocable marital trust (the QTIP trust) for the benefit of decedent during her lifetime. Property in the QTIP trust was treated in Mr. Mellinger's estate as "qualified terminable interest property" (QTIP property) for which a marital deduction was claimed pursuant to section 2056(b)(7). Hugh V. Hunter (Hunter) and Wells Fargo Bank (referred to collectively as cotrustees and coexecutors herein) were the cotrustees of the QTIP trust after decedent's death. Under the terms of the QTIP trust, decedent received a qualified income interest for her lifetime. Upon decedent's death, the QTIP trust provided for the payment of certain periodic and lump sums to the adult children of Mr. Mellinger and decedent, until they attained the age of 65, in addition to certain periodic lump-sum payments to the grandchildren of Mr. Mellinger and decedent, until they attained the age of 30. Upon the final payment to the children and grandchildren, the QTIP trust

property was to be distributed equally to certain tax-exempt charitable organizations. On the valuation date, the QTIP trust held 2,460,580 shares of FOH stock, which then constituted 27.8671 percent of the issued and outstanding stock of FOH.

After Mr. Mellinger's death, decedent removed her share of the community property, 2,460,580 common shares of FOH, from the family trust and contributed it to the revocable trust that she established to be known as the Harriett R. Mellinger Revocable Trust (the Harriett trust). The stock that was held by the Harriett trust also constituted 27.8671 percent of the issued and outstanding stock of FOH. Hunter and Wells Fargo Bank were designated as cotrustees. Under the terms of the Harriett trust, upon the death of decedent, the cotrustees were directed to make certain specific gifts and to sell decedent's personal residence and distribute the sales proceeds to decedent's children. The balance of the Harriett trust was to be held for distribution with certain annual and periodic cash amounts to be made to the children and specified grandchildren. Upon the death of such children and grandchildren, the remaining trust estate was to be distributed equally to certain charitable organizations. At the valuation date, decedent also owned 50 shares of FOH outright.

Hunter and Wells Fargo Bank (coexecutors) filed a United States Estate (and Generation-Skipping Transfer) Tax Return, Form 706, for decedent's estate on January 18, 1994. On the return,

the FOH shares in the Harriett trust were reported at a value of $11,786,178 or $4.79 per share, and the FOH shares in the QTIP trust, includable in decedent's estate pursuant to section 2044, were reported at a value of $11,786,178 or $4.79 per share. In valuing the shares of FOH, the coexecutors consulted legal counsel and obtained two appraisals. The appraisers that were employed by the coexecutors were the investment firm of Janney Montgomery Scott, Inc. (JMS), and the appraisal firm of Willamette Management Associates (WMA). Each appraisal valued the shares as separate 27.8671-percent interests in FOH. The appraisals concluded that, because of the size of the blocks under consideration in relation to the trading volume, petitioner would not be able to sell the holdings in the public market without incurring a blockage discount. The WMA appraisal valued the shares at $4.85 per share, after applying a 30-percent discount, and the JMS appraisal valued the shares at $4.79, after applying a 31-percent discount. Based on the appraisals, the estate valued the shares on its United States Estate Tax Return at $4.79 per share.

In October 1993, FOH filed an Amendment to its Certificate of Incorporation (amendment) resulting in a redesignation of the existing capital stock as class A capital stock and the creation of a new class of nonvoting capital stock designated as class B capital stock. In connection with the amendment, the existing

FOH capital stock was split at the rate of one share for every three shares outstanding. At the same time, FOH declared a distribution in the form of a dividend of two shares of class B capital stock for every one share of class A capital stock outstanding on October 15, 1993. The effect of the amendment, split, and dividend was to convert each three existing shares of FOH capital stock into one share of class A capital stock and two shares of class B capital stock. As a consequence of the recapitalization of FOH, except as set forth below, all rights to vote were exclusively vested in the class A capital stock. The holders of class B capital stock were entitled to vote separately as a class only with respect to designated issues. In addition, the trusts were prohibited from selling any of the class B capital stock for a 2-year period at a price of less than $7.00 per share.

Subsequently, the coexecutors undertook efforts to sell the FOH stock that was held by the trusts in order to raise funds for the payment of Federal estate tax and to provide funds for the required distributions. Accordingly, pursuant to a stock purchase agreement dated January 12, 1994, the FOH Employee Stock Ownership Plan (FOH ESOP) purchased 357,143 shares of FOH class A capital stock from the Harriett trust for $4.20 per share, a 30-percent discount from the closing price of such stock on the New York Stock Exchange (NYSE) on January 10, 1994. In

establishing the value of these shares, the FOH ESOP relied on an appraisal by JMS that expressed an opinion that the appropriate discount for the transaction was between 29 and 31 percent. Thereafter, on February 18, 1994, the Harriett trust sold, in a market transaction on the NYSE, in conformity with Securities and Exchange Commission (SEC) Rule 144, 29,500 shares of FOH class B capital stock at a price of $4.875 per share. The aggregate gross proceeds of the sale received by the Harriett trust were $147,492.71.

On June 14, 1996, FOH, the Harriett trust, and the QTIP trust jointly announced their employment of JMS to sell the FOH stock owned by the trusts and possibly to sell all of the shares of FOH. After holding discussions with numerous prospective purchasers, Knightsbridge Capital Corporation (Knightsbridge) submitted a formal offer to purchase all of the outstanding shares of FOH for not less than $6.00 and not more than $6.25 per share and to merge with FOH. The offer was dated April 9, 1997. The board of directors of FOH determined that this merger was in the best interest of FOH and the stockholders and approved the transaction. Thereafter, the board of directors mailed consent agreements to all shareholders requesting approval for the proposed merger. Approximately 88 percent of FOH stockholders, including the trusts, voted in favor of the merger. After negotiating the price, Knightsbridge and FOH entered into an

agreement dated September 25, 1997. Pursuant to this agreement, Knightsbridge purchased from the Harriett trust and the QTIP trust, all of the FOH shares that were held by the trusts for $6.90 per share. Immediately thereafter, pursuant to the merger agreement, Knightsbridge acquired the remaining outstanding shares of FOH from the remaining shareholders for $7.75 per share.

On examination, respondent determined that the FOH shares that were held by the Harriett trust and the QTIP trust should be merged for valuation purposes, and, in the January 15, 1997, notice of deficiency, respondent indicated that the FOH shares in each trust should be valued at $20,820,159.39 or $8.46 per share.

Overview of FOH

Founded in 1946 by Mr. Mellinger and incorporated in Delaware in 1962, FOH began as a small mail-order operation selling an assortment of intimate women's apparel. In 1947, the business was moved to Hollywood, California, opening its first retail store there in 1952. In its beginning, FOH's name was synonymous with risque lingerie. The company's original market was American GI's who, after spending time abroad, were eager to get for their wives or girlfriends the lingerie that was fashionable in Europe. FOH pioneered many trends in the industry including the extensive use of black, the pointy snow-cone bras of the 1950's, and the revival of garter belts in the 1980's.

The company's products had the reputation of being "slightly naughty" but not offensive, and this style proved to be highly successful in the 1960's and 1970's.

By the early 1980's, however, the risque look of FOH's products began losing appeal. These trends caught FOH off guard, and the company's operations began to falter. At the same time, Mr. Mellinger developed Alzheimer's disease. He retired in 1984 with FOH's profits dwindling. Under new management, FOH enacted a plan to turn the company around. The company's catalogs were purged of nudity, and the black and white pictures were replaced with color photographs of models. On the retail store side, a major overhaul was also enacted. The company spent heavily to upgrade store ambience and to improve the merchandise mix.

All of these steps successfully repositioned FOH as a specialty retailer of intimate apparel. The company operates 206 specialty boutiques in 39 States with the highest concentration of stores in California. FOH developed a mail-order subsidiary to engage in extensive operations in all 50 States, with catalogs published 11 times a year.

For convenience, the following chart shows the net sales, net earnings, earnings per share, total assets, and equity of FOH for the fiscal years ended September 1, 1990; August 31, 1991; August 29, 1992; and August 28, 1993.

| Year End | Net Sales Retail | Net Sales Catalog | Net Earnings | Earnings Per Share | Total Assets | Equity |
|------|------|------|------|------|------|------|
| 1990 | $98,573,000* | | $4,242,000 | $.50 | $35,031,000 | $21,855,000 |
| 1991 | 70,938,000 | $43,196,000 | 5,197,000 | .58 | 39,935,000 | 26,992,000 |
| 1992 | 71,320,000 | 45,710,000 | 5,073,000 | .57 | 45,790,000 | 32,304,000 |
| 1993 | 73,202,000 | 55,314,000 | 4,737,000 | .53 | 50,838,000 | 36,615,000 |

*Total Net Sales for 1990

At the valuation date, FOH had one class of stock outstanding that traded on the NYSE, and those shares were unregistered with the SEC. Additionally, on the valuation date, the average price of FOH stock on the NYSE was $6.9375 per share.

Economic Conditions at the Valuation Date

At the valuation date, the American economy was experiencing a transition from recession to a recovery. The United States gross domestic product (GDP) grew 2.1 percent in 1992 following the 1991 recession. Economic improvements had generally been fueled by low interest rates, increasing corporate profits and strong productivity growth. Despite these positive factors, structural problems, including excessive debt, corporate restructuring and related uncertainties regarding job growth, overvalued real estate, weak banks, defense spending reductions, and consumer confidence continued to hamper the strength and speed of the recovery.

A survey of economists by the Wall Street Journal in early 1993 revealed a consensus estimate of 3-percent GDP growth rate for 1993, with 2.8-percent growth rate expected in the first

half. This rate represents continued moderate growth but is below that normally experienced in postrecessionary years. Nondurable goods expenditures advanced 5.9 percent in 1992 after falling 5.6 percent in 1991.

The California marketplace did not experience the rebound seen in the majority of the nation in 1992. Its economy continued to be impacted negatively by defense industry layoffs and a declining housing market. The Wall Street Journal reported that the California economy was expected to continue to trail far behind the rest of the United States in 1993.

ULTIMATE FINDINGS OF FACT

The fair market value of FOH shares includable in decedent's gross estate should reflect a 25-percent discount for lack of marketability. On the valuation date, the fair market value of each of the two 27.8671-percent interests in FOH that were held by the trusts was $12,802,705, or $5.2031 per share.

OPINION

Issue 1

Section 2031 generally provides that the value of a decedent's gross estate includes the value of property described in sections 2033 through 2044. See sec. 20.2031-1(a), Estate Tax Regs. Under section 2033, the value of a decedent's gross estate includes the value of all property beneficially owned by the decedent at the time of death. See sec. 20.2033-1(a), Estate Tax

Regs. Section 2044(a) includes in the gross estate the value of property in which the decedent had a qualified income interest for life and for which a marital deduction was allowed to the estate of a predeceased spouse under section 2056(b)(7) (QTIP property). Accordingly, at the death of the second spouse, QTIP property is taxed as part of the surviving spouse's estate. Sec. 2044(c).

Property includable in the gross estate is generally included at its fair market value on the date of a decedent's death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is defined as the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all of the relevant facts and neither person being under a compulsion to buy or sell. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer. Propstra v. United States, 680 F.2d 1248, 1252 (9th Cir. 1982). The issue in this case is whether FOH shares in the Harriett trust should be aggregated with FOH shares in the QTIP trust for purposes of ascertaining the fair market value of property passing from decedent.

Historically, undivided fractional interests in property included in an estate have been valued at a discount to reflect lack of marketability and minority interest holdings. See Estate of Andrews v. Commissioner, 79 T.C. 938, 952-953 (1982) (minority interests); Estate of Piper v. Commissioner, 72 T.C. 1062, 1084-1086 (1979) (marketability discount). Respondent, however, has long opposed such discounts and has argued for unity of ownership principles in estate tax cases. See, e.g., Estate of Bonner v. United States, 84 F.3d 196, 198 (5th Cir. 1996); Propstra v. United States, supra at 1251; Estate of Bright v. United States, 658 F.2d 999, 1001 (5th Cir. 1981); Estate of Andrews v. Commissioner, supra at 952-956. Specifically, respondent has argued that a decedent's fractional interest in property should be aggregated with fractional interests owned by family members in the same property for purposes of valuing the property in the estate. Propstra v. United States, supra at 1251; Estate of Bright v. United States, supra at 1001; Estate of Andrews v. Commissioner, supra at 952. Respondent's basis for this position was that such undivided fractional interests should be valued by taking into consideration family cooperation and the likelihood that fractional interests will be sold together rather than separately. See Propstra v. United States, supra at 1251; Estate of Andrews v. Commissioner, supra at 952. Respondent relied on this argument despite section 20.2031-1(b), Estate Tax Regs.,

which ignores subjective factors of ownership in valuing estate assets.  Estate of Bonner v. United States, supra at 198. Ultimately, respondent reviewed this position and conceded that, for estate tax purposes, respondent would follow Estate of Bright v. United States, supra, and Propstra v. United States, supra, where family attribution had been rejected.  See Rev. Rul. 93-12, 1993-1 C.B. 202.

The Court of Appeals for the Ninth Circuit addressed respondent's aggregation theory in Propstra v. United States, supra.  In Propstra, the decedent died with an undivided one-half interest in several parcels of real estate owned by him and his wife as community property.  These parcels of community property had an undisputed fair market value of $4,002,000, but, in valuing the property for estate tax purposes, the executrix discounted the fair market value of the decedent's one-half interest by 15 percent to account for the relative unmarketability of the decedent's undivided fractional interest. The Commissioner disallowed the 15-percent discount, arguing that the decedent's interest in the property should be valued together with the interest owned by the surviving spouse.  "[O]ne can reasonably assume that the interest held by the estate will ultimately be sold with the other undivided interest and that interest's proportionate share of the market value of the whole will thereby by realized."  Id. at 1251.

The Court of Appeals for the Ninth Circuit considered the language of sections 2031 and 2033, along with the accompanying regulations, and decided that Congress did not intend to have "unity of ownership" principles apply to property valuation for estate tax purposes.  Id.  The court stated:

> By no means is * * * [the language of section 20.2031-1(b)] an explicit directive from Congress to apply unity of ownership principles to estate valuations.  In comparison, Congress has made explicit its desire to have unity of ownership or family attribution principles apply in other areas of the federal tax law. See, e.g., I.R.C. secs. 267, 318, and 544.  In the absence of similarly explicit directives in the estate tax area, we shall not apply these principles when computing the value of assets in the decedent's estate. [Id. at 1251.]

The court concluded that the decedent's fractional interest in the subject property should be valued separately from the accompanying fractional interest held by the surviving spouse, upholding the 15-percent discount.  Id. at 1253.

Respondent argues that decedent's situation is distinguishable from Propstra because all of the property to be aggregated in this case is included in decedent's estate.  The FOH shares in the Harriett trust are included pursuant to section 2033, and FOH shares in the QTIP trust are included pursuant to section 2044.  Thus, respondent contends that decedent is considered to be the owner of all of these shares outright for purposes of valuation, in which case the shares should be valued as one 55.7-percent ownership block.  Respondent concludes that,

because the aggregate ownership in decedent's estate represents a controlling interest in FOH, the shares should be valued at a premium rather than at a discount.

Section 2044 was added to the Code in conjunction with section 2056(b)(7) in 1981.  Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 403(d), 95 Stat. 172, 302.  Under section 2056(b)(7), the decedent is entitled to a marital deduction for transfers of QTIP property to the surviving spouse at the decedent's death.  The surviving spouse has a lifetime interest in the QTIP property, and, upon the death of the surviving spouse, the property passes to beneficiaries designated by the decedent.  Accordingly, the first spouse to die can postpone Federal estate tax that would otherwise be due on the QTIP property while also retaining control over the ultimate disposition of it.  Sec. 2056(b)(7).  Inclusion in the estate of the second spouse to die, however, is the quid pro quo for allowing the marital deduction for the estate of the first spouse to die.

The purpose of section 2044 is to provide for the taxation of QTIP property upon the death of the second spouse.  That section provides, in pertinent part, that "The value of the [surviving spouse's] gross estate shall include the value of property * * * [for which a deduction was allowed with respect to the transfer of such property to the surviving spouse under

section 2056(b)(7) and in] which the * * * [surviving spouse] had a qualifying income interest for life."  Sec. 2044(a).  This property is "treated as property passing from the" surviving spouse, sec. 2044(c), and is taxed as part of the surviving spouse's estate at death, but QTIP property does not actually pass to or from the surviving spouse.

Respondent argues that decedent should be treated as the owner of QTIP property for valuation purposes.  Respondent has identified nothing in the statute that indicates that Congress intended that result or that QTIP assets should be aggregated with other property in the estate for valuation purposes.  Cf. secs. 267, 318, 544 (indicating aggregation of interests in terms of ownership).  Furthermore, at no time did decedent possess, control, or have any power of disposition over the FOH shares in the QTIP trust.  Cf. secs. 2035, 2036, 2041 (requiring inclusion in the gross estate where a decedent had control over the assets at some time during her life).

Section 2044 was amended by the Technical Corrections Act of 1982, Pub. L. 97-448, sec. 104(a)(1)(B), 96 Stat. 2365, 2380. The legislative history accompanying that amendment provides no additional guidance on whether the interests involved in this case should be aggregated.  Rather, "The bill clarifies that QTIP property included in a deceased donee spouse's estate is treated as passing from that spouse, for purposes of the estate tax,

including the charitable and marital deductions." S. Rept. 97-592, at 20 (1982), 1983-1 C.B. 475, 483. In addition, the legislative history to the amendment does not suggest that Congress intended that section 2044 property be treated as being owned by the second spouse to die for purposes of aggregation and does not provide for aggregation with other fractional interests in the same property included in the decedent's estate under section 2033. Neither section 2044 nor the legislative history indicates that decedent should be treated as the owner of QTIP property for this purpose.

In Estate of Bonner v. United States, 84 F.3d at 198, the decedent died owning fractional shares in several pieces of real property with the remaining ownership interests being held in a QTIP trust established by his wife at her death. As provided in section 2044, the interest that was held by the QTIP trust was included in the decedent's estate. The fractional shares that were owned outright by the decedent were also included in the decedent's estate pursuant to section 2033. The executor of the decedent's estate, however, valued each interest separately with a 45-percent discount. The Government argued that the fractional interests in the real property should be aggregated for valuation purposes.

The Court of Appeals, relying on its prior holding in Estate of Bright v. United States, 658 F.2d at 1001, concluded that the

fractional interests in the assets should not merge into a 100-percent fee ownership by the estate. The court stated that "the statute does not require, nor logically contemplate that in so passing, the QTIP assets would merge with other assets." Estate of Bonner v. United States, supra at 198. The court also relied on the decedent's lack of control over the disposition of property. Id. at 198-199. The court stated:

> The estate of each decedent should be required to pay taxes on those assets whose disposition that decedent directs and controls, in spite of the labyrinth of federal tax fictions. * * * Mrs. Bonner controlled the disposition of her assets, first into a trust with a life interest for Bonner and later to the objects of her largesse. The assets, although taxed as if they passed through Bonner's estate, in fact were controlled at every step by Mrs. Bonner, which a tax valuation with a fractional interest discount would reflect. At the time of Bonner's death, his estate did not have control over Mrs. Bonner's interests in the assets such that it could act as a hypothetical seller negotiating with willing buyers free of the handicaps associated with fractional undivided interests. The valuation of the assets should reflect that reality. [Id. at 199.]

Respondent also argues that, in enacting sections 2056(b)(7) and 2044, Congress did not intend to alter the estate tax consequences that would otherwise arise if a decedent had transferred property to his or her surviving spouse outright. See H. Rept. 97-201, at 160 (1981), 1981-2 C.B. 352, 378 ("tax laws should be neutral and * * * tax consequences should not control an individual's disposition of property"). Prior to the enactment of sections 2056(b)(7) and 2044, for the first spouse

to get the full marital deduction, the decedent had to leave property to the surviving spouse outright or had to leave property to the surviving spouse in trust with a general power of appointment.  In either situation, the decedent's property was aggregated with the property of the surviving spouse for valuation purposes when the surviving spouse died.  Accordingly, respondent concludes that property in the QTIP trust should be aggregated with the FOH shares in the Harriett trust for purposes of determining the fair market value of the FOH stock.

Section 2044 was designed to prevent QTIP property from escaping taxation by including it in the estate of the second spouse to die.  There is, however, no indication that section 2044 mandated identical tax consequences as an outright transfer to the surviving spouse.

Finally, respondent argues that section 2044(c) is a valuation section, rather than just an inclusion section.  See Estate of Young v. Commissioner, 110 T.C. 297, 308-309 (1998).  In Estate of Young, we held that section 2040 provides an "artificial inclusion" of joint tenancy property, the entire value less any contribution by the surviving joint tenant.  Id. at 315.  We rejected the taxpayer's contention that section 2040 was merely an includability section because Congress had provided an explicit approach to valuing joint tenancy property to be included in the decedent's gross estate.  Id. at 315-316.  Thus,

the entire value of the joint tenancy was included in the estate except for that portion attributable to the consideration supplied by the surviving joint tenant.  Respondent argues that section 2044 provides a similar "artificial inclusion" for the assets held in the QTIP trust, concluding that the analysis in Estate of Young compels a valuation of the FOH shares as if decedent owned the whole block.

Section 2040(b) explicitly sets forth a special rule of valuation for joint tenancy property, but this special rule only applies to section 2040; section 2044 contains no such directive. The absence of such language in section 2044, which was enacted in the same tax act as section 2040(b), belies respondent's argument that Congress mandated or intended a special rule of valuation to apply to property included in a decedent's estate pursuant to section 2044(a).

Issue 2

Based on our conclusion that the two blocks of FOH shares should not be aggregated, we must determine the fair market value of the FOH stock at decedent's death.

Valuation is a question of fact, so we must weigh all relevant evidence to draw the appropriate inferences.  Ahmanson Found. v. United States, 674 F.2d 761, 769 (9th Cir. 1981); Estate of Andrews v. Commissioner, 79 T.C. at 940.  The fair market value of stock listed on an established securities market

is the mean between the highest and lowest selling prices on the valuation date. Sec. 20.2031-2(b)(1), Estate Tax Regs. A blockage discount may, however, be applied when the block of stock to be valued is so large that it cannot be liquidated in a reasonable time without depressing the market. Sec. 20.2031-2(e), Estate Tax Regs. The concept of blockage is essentially one of timing. See Estate of Smith v. Commissioner, 57 T.C. 650, 657-658 (1972), affd. 510 F.2d 479 (2d Cir. 1975).

Petitioner has the burden of proof as to the correctness and amount of the discount. Rule 142(a); Estate of Van Horne v. Commissioner, 720 F.2d 1114, 1117 (9th Cir. 1983), affg. 78 T.C. 728 (1982). This burden is a burden of persuasion, requiring petitioner to prove the merits of its claim by at least a preponderance of the evidence. Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133; Brumley-Donaldson Co. v. Commissioner, 443 F.2d 501, 504 n.4 (9th Cir. 1971), affg. T.C. Memo. 1969-183.

Both parties rely extensively on expert testimony to establish the amount of the discount. Expert opinions are admissible if they will assist the trier of fact to understand evidence that will determine a fact in issue. Fed. R. Evid. 702. We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record. Parker v. Commissioner, 86 T.C. 547, 561 (1986).

However, we are not bound by the opinion of an expert witness, especially when such opinions are contrary to our judgment. IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). Where experts offer divergent estimates of fair market value, we decide what weight to give those estimates by examining the factors used by those experts to arrive at their conclusions. Casey v. Commissioner, 38 T.C. 357, 381 (1962). While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective and use only part of such an opinion. Parker v. Commissioner, supra. We may also reach a determination of value based on our own examination of the evidence in the record. Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).

The parties in this case agree that the undiscounted fair market value of the FOH shares on the valuation date is $6.9375 per share. The parties also agree that a marketability discount is necessary if the shares are not to be aggregated. They disagree, however, as to the appropriate marketability discount to be applied. Respondent contends that the minority blocks of FOH should be valued at $5.8969 per share, a 15-percent discount. Petitioner argues that the shares of FOH have a value of $4.786 per share, a 31-percent discount. Petitioner supports its conclusion with the testimony of Curtis R. Kimball (Kimball) and Ira M. Cotler (Cotler).

Kimball focused on the following methods of disposition to determine the fair market value of the minority blocks of FOH stock: (1) "Synthetic" put option analysis, (2) public secondary offering, and (3) private placement analysis. Kimball explained that the holder of a significant block of shares, such as the FOH block, would be exposed to significant risks when attempting to dispose of the shares in the public market. According to Kimball, the blocks may represent several weeks or months of trading volume, exposing the seller to fluctuations in the market stock price. He explained that a method of eliminating such risk is to buy put option contracts granting the seller the right to sell the shares at a fixed price over a predetermined period. Hence, for a price, the seller would eliminate the risk of downward stock price movement over the disposition period. This approach is called a synthetic option analysis because FOH stock had no actual public market for any options or warrants in existence on the valuation date. Kimball estimated the expense necessary to enter into such options for blocks of FOH stock using several econometrics and theoretic option pricing models, including the Black-Scholes model, the Noreen-Wolfson model, and the Shelton model. He settled on $4.50 per share, a discount of roughly 35 percent, as the most appropriate value. In coming to his conclusion, Kimball indicated that he placed more weight on the Shelton model because of his greater confidence in the

ability of that model to deal with longer holding period option values.

Kimball admitted at trial that his synthetic put option analysis was flawed. In his report, he concluded that the price of FOH shares should be valued in a range of $3.545 to $5.166 per share. However, cross-examination of Kimball indicated several mathematical errors in his calculations of the Black-Scholes and Noreen-Wolfson models that are intended to estimate the expense necessary to enter into put options. Respondent also pointed out that there was an alternative calculation of the Shelton model. After the adjustments, the new range in price for FOH shares using the put option methodology was between $5.689 and $5.9372, indicating a discount range of between 14.4 and 18 percent.

Second, Kimball analyzed the secondary offering approach to valuation. As part of his research, Kimball reviewed various studies that were performed to analyze the costs of a secondary offering and similar transactions. Using this approach, Kimball concluded that the fair market value for the subject FOH shares was between $5.286 and $5.037 per share. He noted that the risks of an unsuccessful secondary offering factored into his determination of where, within this range, FOH shares would be priced. He selected a fair market value of $5.10 per share, a discount of about 26.5 percent, as the appropriate value under this approach.

Kimball made no effort to compare the subject transaction to transactions within the secondary offering studies that have similar characteristics, such as where the stock is traded, revenues, sales, and similar factors indicating analogous transactions. Instead, he relied primarily on the mean and median discounts of each study. Petitioner admits on brief that Kimball relied very little on the secondary offering approach and concedes that Kimball relied most heavily on the private placement analysis in coming to his conclusion.

Kimball used the primary body of empirical evidence concerning private placement data, as found in studies of restricted stocks, to analyze the private placement market. Kimball concluded that various surveys reviewed by him indicated a cumulative average discount of 35 percent for restricted stock in a publicly traded company. He ultimately concluded that a 32-percent discount was appropriate considering the combined influences of all of the relevant factors under this approach. Applying the 32-percent discount to the market price on the valuation date results in a fair market value of $4.72 per share.

Petitioner also offered the expert testimony of Cotler to establish the applicable discount. Cotler testified that he analyzed numerous studies to determine the appropriate discount for lack of marketability. From these studies, Cotler observed that there was a mean discount of 34.73 percent for lack of

marketability.  Cotler indicated that the discount is most sensitive to block size.  For example, a block of stock that represented 39 percent of the outstanding shares averaged a 38.7-percent discount.  Cotler further testified that, in order to value properly the FOH stock, there must be a thorough analysis of FOH's operations, the markets it serves, and the characteristics of the FOH stock held by the trusts.

Cotler expressed an opinion that, at the valuation date, FOH was experiencing an accelerating negative financial performance. Cotler also noted that a large factor influencing the negative results of FOH could be related to the U.S. economy and the recession in California at the valuation date.  Cotler also testified that consumer confidence was dropping in the fourth quarter of 1992 and that the retail sector was anticipating a difficult year with continued discounting of merchandise likely in order for retailers to maintain sales levels.

Cotler opined that the declining interest in FOH common stock was likely attributable to a number of factors, the most significant being the continuing decline in FOH's operating performance and the low expectations of a near-term turnaround. From an analysis of the common stock trading patterns, he concluded that there was a relatively low level of investor interest in FOH, and selling a large block of FOH common stock would be very difficult.  Cotler further observed that the FOH

stock in issue represented a significant percentage of the then-outstanding shares, 27.8 percent. With the average volume during the first 6 months of 1993 at 5,197, Cotler concluded that it was improbable that the FOH stock could have been sold in the public market within a reasonable time frame.

Cotler pointed to the size of the block, FOH's recent and expected financial performance, and the overall trading characteristics of the FOH common stock as reasons why it would be difficult to sell the FOH stock at a price equal to the publicly traded common stock. Based upon this analysis, his experience as an investment banker, and other information available to him, Cotler concluded that the fair market value of the FOH stock at the valuation date should be $4.79, a 31-percent discount.

Respondent determined that the value of the blocks of FOH shares that were held in the trusts must be discounted between 10 and 17 percent to reflect the lack of marketability. Respondent supports this determination with the expert testimony of David N. Fuller (Fuller).

Fuller agreed with petitioner's experts that a discount for lack of marketability was appropriate when disposing of the separate minority interests in FOH. He testified that there were three viable options for selling the separate blocks of FOH stock: (1) A registered secondary offering, (2) a private

placement of the stock, or (3) a periodic sale subject to volume restrictions under SEC rule 144. With respect to the registered secondary offering, Fuller testified that a discount between 10 and 13 percent was warranted. He also testified that, under a periodic sale subject to SEC rule 144, the minority interests in FOH should be discounted between 13 and 17 percent. However, Fuller ultimately dismissed these options concluding that none were viable and that the private placement analysis was the exclusive means by which to value the blocks of FOH stock. Specifically, Fuller testified that a secondary offering was not feasible because it would require the consent of FOH management. Likewise, he concluded that it would take 7 years to liquidate the stock under the periodic sales method, rendering that means of disposition inadequate.

Instead, he concluded that a private placement was the likely means of disposition. In calculating the discount for a private placement of FOH stock, Fuller indicated that holding period restrictions were the primary reason for the discount. To ascertain the applicable discount, Fuller reviewed several restricted stock studies on private placement transactions. Fuller recognized that the combined results of these studies indicated a 35-percent marketability discount. He, however, concluded that the studies suffer because they review only restricted share transactions and do not include a sample of

similar private placement block sales of registered shares.  In contrast, Fuller relied on a study that analyzed 106 private placement transactions of both restricted and registered shares. This study concluded that discounts were required by private placement investors because of information costs that they bore in investigating the value of shares in the issuing firms as well as from anticipating "monitoring costs" associated with the investment (i.e., assistance in the formulation of management policy and oversight of existing management).  He noted that the sale of restricted shares rather than registered shares in private placements resulted in a discount of 13.5 percent.

Fuller also used a study being conducted by Business Valuation Services, Inc. (BVS), his firm, as a "sanity check". The study analyzed private placement transactions and revealed, after an analysis of 51 transactions, a mean discount of 16.2 percent.  Fuller pointed out that, for private placements of companies with market capitalizations greater than $50 million, BVS observed an average discount of 11.1 percent, and, as of the valuation date, the market capitalization of FOH was $61.3 million.  For companies with annual sales greater than $100 million, BVS observed an average discount of 7.2 percent, and, for the 12-month period ended February 27, 1993, FOH had sales of $125.5 million.

Fuller concluded that a prudent investor would select the private placement alternative and that, under that analysis, the FOH shares should be valued at $5.8969 per share, a blockage discount of 15 percent. Accordingly, each block of 2,460,580 shares of FOH would be valued at $14,509,794.

Fuller relied almost exclusively on the private placement analysis that hinged on a single study. In so doing, he rejected an entire body of restricted stock studies covering an extensive time span. Fuller applied a 13.5-percent discount to the market price of freely tradeable stock sold on the public market. The study on which he relied, however, found that the discount for restricted stock, when compared with freely tradeable stock sold in a public market, averaged 42 percent of the market price.

Petitioner points to the subsequent sales of FOH shares by the trusts, arguing that, although fair market value is determined as of the date of death, consideration is given to comparable sales occurring subsequent to the valuation date for purposes of determining fair market value. Estate of Jung v. Commissioner, 101 T.C. 412, 431 (1993). Petitioner concludes that, because the sales by the trusts were consistent with the valuations by Kimball and Cotler, the sales corroborate the value claimed by petitioner and are substantial evidence of the fair market value of the FOH stock on the valuation date.

The sale of FOH stock by the Harriett trust to the FOH ESOP for a price of $4.20 per share, which represented a discount of 30 percent from its then-closing price on the NYSE, occurred 9 months after the valuation date.  Respondent argues that this was not a sale to a third party, so it should not be taken into consideration in valuing the stock.  In any event, this sale was of class A capital stock after the amendment to the articles of incorporation that altered the capital structure of FOH.  After the amendment, there were two classes of stock, one with voting rights and the other without.  Neither party addressed how this fact affects the valuation.  Thus, we are cautious in assigning weight to this transaction.

The market transaction in which the Harriett trust sold 29,500 shares of FOH stock at $4.875 per share on February 18, 1994, does not support petitioner's contentions, because those shares sold for the undiscounted price at which the stock was trading on the NYSE on that day.

On the record before us, we are satisfied that the respective discounts as determined by the experts set the appropriate range from which we may determine the marketability discount.  We also conclude, however, that each expert excluded information that contradicted his result.  Only Cotler addressed the specifics of FOH's financial situation in detail, but he relied on mean discounts without relating them to those details.

Fuller relied on a single method, and we are not persuaded that his method is the only one that would be considered by hypothetical buyers and sellers.  Kimball provided several logical methods but failed to implement them correctly.  On cross-examination, he made several concessions about his use of survey data as well as his errors in application of the formulas he used.

We conclude that the discount claimed by petitioner is necessarily overstated, but the discount asserted by respondent is inadequate.  Weighing the expert opinions and the evidence on which they rely, we have more confidence in the methods of petitioner's experts but must adjust their conclusions to reflect their weaknesses.  We bear in mind that valuation is necessarily an approximation and a matter of judgment rather than mathematics.  Estate of Davis v. Commissioner, 110 T.C. 530, 554 (1998).  Based on our examination of the entire record in this case, we conclude that the marketability discount should be 25 percent.  We thus have found that, on the valuation date, the fair market value of each of the two 27.8671-percent interests in FOH that were held by the trusts was $12,802,705, or $5.2031 per share.

To reflect the foregoing,

Decision will be entered

under Rule 155.