T.C. Memo. 2011-28

UNITED STATES TAX COURT

ESTATE OF AXEL O. ADLER, DECEASED, ANNA AXINA ADLERBERT,
ADMINISTRATOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25113-08.                    Filed January 31, 2011.

<u>Benjamin Crispin Sanchez</u> and <u>Martin J. Tierney</u>, for
petitioner.

<u>Trent D. Usitalo</u> and <u>Nicholas D. Doukas</u>, for respondent.

MEMORANDUM OPINION

MORRISON, <u>Judge</u>:  In a notice dated July 18, 2008, the
respondent (the IRS) determined a deficiency in the federal
estate tax of the Estate of Axel O. Adler (the estate).  The
estate and the IRS agreed to submit this case for decision under

Rule 122.[1]  The parties executed a stipulation of settled issues, leaving one issue to be resolved.  The issue is whether the value of approximately 1,100 acres of land included in the value of the gross estate is subject to fractional-interest discounts.  We find that it is not.

## Background

We adopt the stipulation of facts as our findings of fact.

The decedent, Axel O. Adler (Adler), died on June 20, 2004. At the time of his death, Adler resided at 26446 Oliver Road, Carmel, California.  Anna Axina Adlerbert is the administrator of the Estate of Axel O. Adler.  At the time she filed the petition, Anna Axina Adlerbert resided at Jarkholmsvarden 616, 63656 Hovas, Sweden.

Before December 8, 1965, Adler owned property on Palo Colorado Road in Carmel, California.  That property, known as the Rancho Aguila property, consisted of approximately 1,100 acres at the date of his death.

On December 8, 1965, Adler executed a grant deed transferring undivided one-fifth interests[2] in the Rancho Aguila

---

[1]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code (Code) as in effect for the date of Axel O. Adler's death.

[2]The owner of an undivided interest does not have a claim on a specific portion of the property.

property to his five children--Inna Maria Adler, Lena Kristina Bidegard, Dag Ivar Adler, Ruth Erikka Adlerbert, and Axel Jerker Adlerbert--as tenants in common. The deed, however, expressly stated that Adler "[reserved] unto himself the full use, control, income and possession of * * * [the Rancho Aguila property] and every part thereof for and during * * * [his] natural life". The transfer was gratuitous; Adler received no consideration.

After the transfer, Adler continued to use the Rancho Aguila property. None of his children resided there. Nor did the children interfere with his use, possession, or enjoyment of the property. Adler paid all expenses associated with the property, including taxes, upkeep, and maintenance. Adler was not required to--and did not--pay rent to the children. Adler was not required to--and did not--seek the children's permission to alter or improve the property.

On August 16, 1991, daughter Inna executed a quitclaim deed[3] transferring her interest back to Adler, but neither she nor Adler recorded the deed. Adler died on June 20, 2004. The parties have stipulated that on that date, the fair market value

---

[3]It is unclear whether daughter Inna received consideration for the transfer. The quitclaim deed states that the transfer was "for a valuable consideration". In the petition, the estate claimed that the conveyance was in exchange for the cancellation of daughter Inna's debt to Adler of 150,000 Swedish kronor. In the answer, the IRS denied this for lack of sufficient knowledge. The stipulation of facts does not address whether the transfer was gratuitous or for consideration.

of a fee simple interest in the entire Rancho Aguila property was $6,390,000. Because Adler and daughter Inna never recorded the 1991 quitclaim deed, litigation over her interest occurred during the probate of Adler's estate. As a result, daughter Inna executed a grant deed transferring her interest in the Rancho Aguila property to the estate in May 2005.

At issue is whether the value to include in the value of the gross estate is (i) the undiscounted value of a fee simple interest in the Rancho Aguila property or (ii) the value of several fractional interests in the Rancho Aguila property, which must be valued separately with appropriate fractional-interest discounts. As explained below, we find that no discount is appropriate.

## Discussion

Section 2001(a) imposes the estate tax on the transfer of the taxable estate of a decedent. Section 2051 defines the value of the taxable estate as the value of the gross estate minus the estate-tax deductions. The value of the gross estate is "determined by including to the extent provided for in * * * [sections 2031 through 2046], the value at the time of * * * [the decedent's] death of all property, real or personal, tangible or intangible, wherever situated." Sec. 2031(a).

Section 2033 includes "the value of all property to the extent of the interest therein of the decedent at the time of his death" in the value of the gross estate.  Thus section 2033 includes the value of the decedent's interest in property at the time of death.

If a decedent owned a life estate,[4] section 2033 would not include its value in the value of the gross estate.  A life estate has no value at the time of death.  But if the decedent gratuitously transferred a remainder interest in property and retained a life estate, the value of the property would be included in the value of the gross estate by section 2036.  Section 2036(a) provides:

> The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--
>
> (1) the possession or enjoyment of, or the right to the income from, the property, or
>
> (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

---

[4]We use the term "life estate" here to refer to only a life estate measured by the life of the decedent; we do not include a life estate for the life of another in the term "life estate".

Section 2036(a)(1) thus includes the value of transferred property in the value of the gross estate if three conditions[5] are met:  (i) the decedent transferred an interest in the property during life, (ii) the transfer was not a sale, and (iii) the decedent retained possession or enjoyment of the property for life.[6]  Sec. 20.2036-1(a), Estate Tax Regs.; see also Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005).  If a decedent gratuitously transferred a remainder interest in property and retained a life estate, the decedent transferred the property while retaining possession or enjoyment for life, and thus section 2036(a)(1) would apply.

The general purpose of section 2036 is to include the value of property in the value of the gross estate where the decedent transfers the property during life and the transfer is essentially testamentary in nature.  United States v. Estate of Grace, 395 U.S. 316, 320 (1969) (discussing statutory predecessor of section 2036).  A testamentary transfer is a transfer made in a will.  Black's Law Dictionary 1636 (9th ed. 2009).  Transfers included under section 2036(a)(1) are essentially testamentary in nature because the transferor controls the disposition of the

---

[5]See also sec. 2036(c) (limiting application of sec. 2036(a) for transfers made before Mar. 4, 1931 and for transfers made after Mar. 3, 1931, but before June 7, 1932).

[6]Sec. 2036(a) also applies to other situations not relevant here.

property at death but possesses and enjoys the property during life.

If section 2033 or section 2036 includes the value of property in the value of the gross estate, the amount included is the property's fair market value at the time of death (or on the alternate valuation date, if the executor so elects). Sec. 20.2031-1(b), Estate Tax Regs. Fair market value in the context of the estate tax is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Id. The standard is an objective standard, which determines fair market value by neither a forced sale price nor a price in a market "other than that in which * * * [the type of property] is most commonly sold to the public". Id.; see also Estate of Kahn v. Commissioner, 125 T.C. 227, 230-231 (2005) (discussing fair market value).

The owner of a fractional interest in property[7] often lacks the ability to control the property or to sell the interest freely. See, e.g., Estate of Amlie v. Commissioner, T.C. Memo.

---

[7]A "fractional interest" in property is also known as an "undivided interest". See Black's Law Dictionary 728, 885-886 (9th ed. 2009). An undivided interest is commonly understood to be "an interest held under the same title by two or more persons" and includes interests held as tenants in common. Id. at 886.

2006-76 (applying fractional-interest discounts); Estate of

Pillsbury v. Commissioner, T.C. Memo. 1992-425 (same).  To

reflect the decrease in value the estate claims was caused by the

fractional ownership of the Rancho Aguila property, the estate

applied minority-interest and marketability discounts.[8]  A

minority-interest discount is due to lack of control; a

marketability discount is due to lack of liquidity.

When a person dies holding a fractional interest in

property, it is often appropriate to discount the value of the

interest because the lack of control and the lack of liquidity

decrease the property's value.  Whether property should be valued

as a whole or as separate fractional interests--with appropriate

discounts for split ownership--depends on when the interests are

separated.  If ownership is split during the decedent's lifetime,

the interest the decedent retained is valued separately.  If the

split occurs only at death, the property is valued as a whole--

without a discount for split ownership.  Suppose, for example,

---

[8]On Form 706, United States Estate (and Generation-Skipping
Transfer) Tax Return, Schedule A, Real Estate, the estate
reported a one-fifth interest in the Rancho Aguila property
subject to a "32% marketability discount and a 16% minority-
interest discount".  Exhibit 2-J at 15.  On Form 706, Schedule G,
Transfers During Decedent's Life, the estate reported four
separate one-fifth interests in the Rancho Aguila property, each
subject to a "22% marketability discount and a 16% minority-
interest discount".  Id. at 21-22.  Form 706, Schedule A, lists
real property owned by the decedent, including property to which
sec. 2033 applies.  Form 706, Schedule G, lists certain inter
vivos transfers, including transfers to which sec. 2036 applies.

that an owner of land gives a one-half interest in the land to a child. When the owner dies holding the remaining one-half interest, that interest should be valued separately from the child's: the interests were separated during the owner's life. See Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982) (before he died, the husband held a one-half community-property interest in land and his wife held the other one-half interest; the husband's interest at death was valued separately from the wife's interest). On the other hand, suppose that an owner of land continued to own the land until death, and at his death, pursuant to his will, the land was transferred to his two children. Because the owner owned the land at death, no discount would be recognized to account for the fact that the land later had multiple owners. See Ahmanson Found. v. United States, 674 F.2d 761, 768 (9th Cir. 1981) (in valuing the assets of an estate, the property valued is not the property received, and thus no discount is made for the fact that the asset will "come to rest in several hands rather than one"; to do so would invite abuse).

For these purposes, the ownership of the Rancho Aguila property should be considered to have been split up at Adler's death. In 1965, Adler transferred a one-fifth remainder interest to each of his five children. He retained a life estate in the property. Thus, it was as if Adler had retained the entire

interest in the land during his life and transferred the property to his children at death. The two transactions are not identical, but their similarity led Congress to enact section 2036, which treats the inter vivos transfer of a remainder interest with a retained life estate as a testamentary transfer of the entire property. Section 2036 is significant because it is the Code section that primarily includes the value of the property in the value of the gross estate.[9] It is consistent with section 2036 to value the Rancho Aguila property as if the children's interests were transferred only at Adler's death. A property interest transferred to separate owners at death is not valued separately for estate tax purposes.

Of the cases the estate cites for the idea that we must value multiple interests in the Rancho Aguila property separately, the closest to being on point is Estate of Mellinger v. Commissioner, 112 T.C. 26 (1999). In Estate of Mellinger, a wife and husband owned a block of stock as community property. Id. at 27. The husband died first and left his interest to a qualified terminable interest property trust for the lifetime

---

[9]The estate argues that it is sec. 2033--not sec. 2036--that includes the value of the one-fifth interest that was transferred from Adler to daughter Inna in 1965 and that daughter Inna transferred (or attempted to transfer) back to Adler in 1991. Even if this is true, the other four interests should be considered to have been split from the remaining interest only at Adler's death, and therefore no discount to the value of the remaining interest should be made to account for separate ownership of the other four interests.

benefit of his wife.  Id.  When the wife died, she still owned her one-half interest in the stock, the value of which was included in the value of her gross estate under section 2033. The value of the husband's interest was also included in the value of the gross estate under section 2044.  We held that the interests must be valued separately and that discounts were appropriate.  One reason the interests were valued separately was that at no time did the wife "possess, control, or have any power of disposition" over the interest held in the trust.  Id. at 36. Unlike the wife in Estate of Mellinger, Adler controlled the Rancho Aguila property.[10]  He transferred remainder interests in the property in 1965, and he retained a life estate in the property from 1965 until his death in 2004.

---

[10]In Estate of Fontana v. Commissioner, 118 T.C. 318 (2002), we declined to interpret Estate of Mellinger v. Commissioner, 112 T.C. 26 (1999), to require separate valuation of two interests in property where the decedent controlled both interests.  In Estate of Fontana v. Commissioner, supra at 318-319, the estate sought to value two blocks of stock separately; the decedent owned one block outright and the other was subject to the decedent's testamentary general power of appointment.  The value of both blocks of stock was included in the value of the gross estate. Id. at 319.  The value of the stock the decedent owned outright was included under sec. 2033.  Id.  And the value of the stock that was subject to the decedent's power of appointment was included under sec. 2041.  Id.  Because the decedent in Estate of Fontana controlled the disposition of the stock that was subject to the general power of appointment (unlike the property in the qualified terminable interest property trust in Estate of Mellinger), we aggregated it with the stock the decedent owned outright for valuation purposes.  Id. at 322.

The parties agree that the value of the entire Rancho Aguila property is included in the value of the gross estate. The parties stipulated that the fair market value of the Rancho Aguila property on the date Adler died was $6,390,000. As discussed above, we find that no discount is appropriate because Adler controlled the disposition of the entire Rancho Aguila property, and to apply a discount in this situation would value the property according to the number of recipients. Thus the value included in the value of the gross estate is $6,390,000, the Rancho Aguila property's fair market value as of June 20, 2004, the date Adler died.

To reflect the foregoing,

Decision will be entered under Rule 155.