T.C. Memo. 2001-72

UNITED STATES TAX COURT

ESTATE OF AUGUSTA PORTER FORBES, DECEASED,
FREDERICK W. ORR, JR., EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24492-97.                    Filed March 23, 2001.

J. Nelson Irvine, Bruce C. Bailey, and John P. Cowart, Jr.,
for petitioner.

John W. Sheffield III, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  Respondent determined that petitioner is
liable for a $1,665,230 deficiency in Federal estate tax and a
$222,332 penalty under section 6662(g) for a substantial estate

tax valuation understatement.[1]  The issues for decision are: (1) The fair market value at the date of decedent's death of undivided fractional interests in two parcels of real property held in a qualified terminable interest property trust (QTIP trust) in which decedent had an income interest for life. Subsumed in this issue is whether these undivided fractional interests include interests in certain timber and pecan orchards located on the parcels; and (2) whether petitioner is liable for a penalty under section 6662(g).

FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate in our findings by this reference.

<u>Decedent</u>

On December 26, 1993, Augusta Porter Forbes (decedent) died.  At the time of her death, she resided in Atlanta, Georgia. Her estate was administered in Fulton County, Georgia.[2]

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The record does not conclusively establish the residence or principal place of business of the executor of decedent's estate, Frederick W. Orr, Jr., as of the date the petition was filed.  The petition provides only the executor's mailing address in care of a law firm in Atlanta, Georgia.  Decedent's amended Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, signed Sept. 23, 1997, lists the executor's address as a Cashiers, N.C., post office box.

Mr. Forbes

In 1982, decedent was married to Walter T. Forbes, Sr. (Mr. Forbes).  By a previous marriage, Mr. Forbes had two children: Walter T. Forbes, Jr. (Walter), and Betty F. Rayburn (Betty).

In 1982, Mr. Forbes owned individually approximately 2,058 acres of land in Macon and Houston Counties, Georgia (the Forbes land).  In 1982, the Forbes land included approximately 676 acres of timberland and 338 acres of pecan orchards.  The remainder was open crop land, creek bottoms, slopes, gullies and drains, low-lying land along Baptist Creek and Indian Creek, yards, roads, and other areas around barns and sheds.  Mr. Forbes also owned farm assets and operated a farming business on the Forbes land in the form of a sole proprietorship known as Malatchie Farms (the sole proprietorship).

The Limited Partnership

On or about March 25, 1982, Mr. Forbes, Walter, and Betty formed a limited partnership, Malatchie Land Co., L.P. (the limited partnership).  The partnership agreement contains the following statement of purpose:

> The purpose and character of the business of the Partnership is as follows:  to purchase, lease and sell real estate, including farm and ranch properties, and to do the things necessary or advisable or expedient in connection with or incidental to such business.

The partnership agreement provides that each of the three partners will have ownership interests in accordance with their initial capital contributions, as follows:

| Partner | General Partner Interest | Initial Equity Capital Amount As A General Partner | Limited Partner Interest | Initial Equity Capital Amount As A Limited Partner |
|---|---|---|---|---|
| Mr. Forbes | 42% | $420 | 42% | $562,978 |
| Walter | 29% | 290 | 29% | 389,855 |
| Betty | 29% | 290 | 29% | 389,855 |

The partnership agreement states that the initial equity capital contributions are to be made either in cash or in the form of property valued at fair market value.

Under the partnership agreement, all deduction or loss items, as well as net cash receipts of the partnership, are to be allocated and disbursed to the general partners in accordance with the participation percentages set forth above. The partnership agreement provides that upon the death of a general partner, the business will be continued by the remaining general partners and that, absent a buy-sell agreement among the partners, the partnership interests of the deceased general partner will vest in his heirs, legatees, successors, trustees, receivers, other legal representatives, or assignees, who would then be admitted as substituted limited partners with the consent of the remaining general partners. Upon the termination of the sole remaining general partner, if the limited partners designate

a substituted general partner, the business of the partnership is to be continued as a limited partnership that will succeed to all assets of the general partnership; otherwise, the general partnership is to be dissolved and liquidated, with the net proceeds of the liquidation to be distributed according to the participation percentages set forth above.

Contributions of Land to the Limited Partnership

Upon formation of the limited partnership, Mr. Forbes transferred to it title to all 2,058 acres of his land. The transfer was evidenced by a warranty deed dated March 25, 1982, stating that in consideration of $1 and 562,978 limited partnership units, Mr. Forbes conveyed to the limited partnership "a full undivided interest" in his land "together with all hereditaments and appurtenances thereto appertaining".[3] The warranty deed otherwise contains no reference to timber, pecan trees, or growing crops.

Similarly, upon formation of the limited partnership, Walter, Betty, and Mr. Forbes (as trustee of a trust created in 1959 for the benefit of Walter and Betty) executed warranty deeds transferring to the limited partnership approximately 3,296

---

[3] Thus, for purposes of valuing initial equity capital contributions of Walter T. Forbes, Sr. (Mr. Forbes), the 2,058 acres of the Forbes land was treated as having fair market value of $562,978. The record does not reveal the basis for this valuation, nor the basis of the initial equity capital contributions by Walter T. Forbes, Jr., (Walter) and Betty F. Rayburn (Betty), discussed infra.

acres, "together with all hereditaments and appurtenances thereto appertaining". In consideration, Walter and Betty each received $1 and 389,855 limited partnership units.

The last-mentioned 3,296 acres, together with the 2,058 acres contributed by Mr. Forbes individually, make up the 5,354 acres that were conveyed to the limited partnership (sometimes referred to herein as the subject property).

Ongoing Conduct of Mr. Forbes' Sole Proprietorship

After the formation of the limited partnership, Mr. Forbes continued to conduct his commercial farming business, including the growing of timber and pecans, as a sole proprietor on the Forbes land. The limited partnership did not conduct any business growing timber, pecans, or other crops. After transferring the Forbes land to the limited partnership, Mr. Forbes continued to receive all income from timber, pecans, and other assets located on the Forbes land. During his lifetime, Mr. Forbes reported all such income and deducted all related expenses, including depreciation, on his individual Federal income tax returns.

Similarly, after transferring their land to the limited partnership, Walter and Betty each continued to receive and report all income from timber, pecan orchards, and other assets located on the land they had contributed.

Mr. Forbes, Walter, and Betty never treated or reported the timber, crops, or other improvements as having been transferred to the limited partnership for economic, financial, income tax, or other purposes.

Creation of the General Partnership

On December 20, 1983, Walter and Betty formed a general partnership known as Malatchie Farms (the general partnership). They each owned a 50-percent interest in the general partnership, with Walter designated as managing partner. As stated in the partnership agreement, the purpose of the general partnership was "to conduct farming operations in Houston and Macon Counties, Georgia, and in such other places as the parties may from time to time agree" and "to engage in the business of wildlife preservation, farming and other similar activities".

Timber Contract

On August 2, 1984, 18 days before Mr. Forbes died, Walter executed a "Timber Deed" on behalf of the general partnership. The timber deed indicates that the general partnership was thereby selling to Tolleson Lumber Co., Inc. (Tolleson Lumber), for $21 per ton "all merchantable pine timber" on a portion of the Forbes' land. The timber deed provided Tolleson Lumber 18 months to cut and remove the timber.

Creation of QTIP Trust Upon Mr. Forbes' Death

In his will, Mr. Forbes created a QTIP trust, pursuant to section 2056(b)(7), for decedent's exclusive benefit. The will directs that "the entire remainder of my estate" shall be transferred to trustees of the QTIP trust to be held in trust for decedent during her lifetime. The will provides that upon Augusta Porter Forbes' death, the remaining principal and undistributed income of the QTIP trust shall be distributed free of trust to Walter and Betty.

The sole trustee of the QTIP trust was American National Bank & Trust Co. of Chattanooga (the QTIP trustee).

Distribution of Property to QTIP Trustee

As of July 31, 1986, the entire remainder of Mr. Forbes' estate (the Forbes estate) consisted of only two assets: (1) The 42-percent interest in the limited partnership; and (2) the assets of the sole proprietorship.

By general bill of sale dated August 1, 1986, the executors of the Forbes estate transferred to the QTIP trustee "all of the property owned and operated by" Mr. Forbes in the sole proprietorship, including machinery and equipment, certain out-buildings and other items of personal property, and "All growing crops and timber on land owned by" the limited partnership.

By execution of another general bill of sale, also dated August 1, 1986, the QTIP trustee conveyed to Walter and Betty,

doing business as the general partnership, "all of the property conveyed to * * * [the QTIP trustee] by an Executor's General Bill of Sale of even date conveying all of the property owned and operated by" Mr. Forbes, doing business as the sole proprietorship. The assets so conveyed are described in language identical to that contained in the general bill of sale from the executor to the QTIP trustee, specifically including "All growing crops and timber on land owned by" the limited partnership. On its books, the general partnership recorded receipt of all the timber and growing crops on the Forbes land. The pecan trees as well as the pecan nuts were treated as growing crops.

In consideration of all the sole proprietorship assets, the general partnership agreed to pay the QTIP trustee $550,742, less a $100,000 offsetting credit for net liabilities that the Forbes estate owed the general partnership. Accordingly, the general partnership gave the QTIP trustee a promissory note for $450,742. The purchase price was the result of arm's-length bargaining and was based on values reflected on the Forbes estate tax return (which in turn were based on a 1985 independent appraisal), with certain adjustments, including the addition of certain amounts received or receivable under the timber contract with Tolleson Lumber.[4]

---

[4] Although the record is sketchy in this regard, the evidence does not indicate, and respondent has not suggested,
(continued...)

Following the August 1, 1986, sale, the general partnership managed all the assets, including all the timber and pecan trees, on the land held by the limited partnership, and reported all timber and pecan business sales and expenses on all of the land held by the limited partnership.

On May 1, 1987, the executors of the Forbes estate conveyed to the QTIP trustee the Forbes estate's interest in the limited partnership by endorsing the certificate of limited partnership units.

Termination of the Limited Partnership and the General Partnership

On October 7, 1988, Betty and Walter executed a Partnership Termination, Division and Release Agreement (the termination agreement), terminating both the limited partnership and the general partnership, effective December 31, 1987.  In the termination agreement, Walter and Betty agreed that the assets of the limited partnership and the general partnership would be distributed so that Walter and Betty would each receive equal net values, based upon independent appraisals, and that the QTIP trust would continue to have a 42-percent undivided interest in all of the land, excluding improvements, crops, trees, and profits.  By the termination agreement, Walter and Betty agreed

---

[4](...continued)
that the Forbes estate claimed and was allowed a deduction for property interests in excess of those with which the executor of his estate funded the QTIP trust.

to have the 5,354 acres owned by the limited partnership divided into two separate parcels--the North Property (containing 2,033 acres) and the South Property (containing 3,321 acres). Both parcels contained pecan orchards and timber.

The termination agreement (wherein Walter and Betty are referred to as Forbes and Rayburn, respectively, and the QTIP trustee is referred to as the Trustee) states in part:

> WHEREAS, Rayburn and Forbes each has had a 29 percent interest and the Trustee a 42 percent interest in * * * [the limited partnership];

> WHEREAS, the principal if not sole, asset of * * * [the limited partnership] is that real property, (excluding improvements, crops, trees, profits and items other than the land itself) lying in Macon and Houston Counties, (the "Realty") which has been rented by * * * [the limited partnership];

> &ast; &ast; &ast; &ast; &ast; &ast; &ast;

> WHEREAS, pursuant to the termination of Malatchie Land, a portion of the Realty (the "South End") is being distributed to Rayburn and the Trustee, Rayburn to have a 58% interest and the Trustee to continue with its 42% interest and the Trustee to continue with its 42% interest in the South End, and the other portion of the Realty (the "North End") is being distributed to Forbes and the Trustee, Forbes to have a 58% interest and the Trustee to continue with its 42% interest in the North End;

> &ast; &ast; &ast; &ast; &ast; &ast; &ast;

> WHEREAS, after * * * purchase * * * [of certain previously specified assets, the general partnership], except for a few limited items, will be the owner of virtually all the buildings and other improvements on the Realty, together with nearly all the personal property, fixtures, timber, crops, trees, fruits, profits and other items upon the Realty, (the "Improvements and Personalty");

WHEREAS, * * * [the general partnership] acquired from the Trustee certain of the Improvements and Personalty in consideration of a promissory note in the amount of $450,742.00 * * *;

WHEREAS, Rayburn and Forbes have also agreed to terminate * * * [the general partnership] effective as of December 31, 1987 and to divide the assets of * * * [the general partnership], (inclusive of the Improvements and Personalty) taking into account the Realty received by each from * * * [the limited partnership] and the payment of certain monies between or for the account of Rayburn and Forbes;

* * * * * * *

NOW, THEREFORE, * * * Rayburn and Forbes hereby agree as follows:

1. <u>Termination and Dissolution of Farms and Malatchie Land</u>. Rayburn and Forbes acknowledge and agree that effective as of 11:59 p.m. December 31, 1987, * * * [the general partnership and the limited partnership] are each terminated and dissolved, and all assets of * * * [the general partnership and the limited partnership] have been distributed pursuant to the agreements between Rayburn, Forbes, and Trustee, as applicable * * *.

* * * * * * *

3. <u>Division of Assets</u>. Forbes and Rayburn agree that the assets and liabilities of * * * [the limited partnership and the general partnership] upon dissolution, excluding that portion of * * * [the limited partnership] distributed to the Trustee, are to be distributed in such manner that the net values of properties received, after deducting liabilities assumed, and taking into account other monetary adjustments between the parties, result in an equal distribution to both parties.

* * * * * * *

5. <u>Title to Assets Distributed</u>. (a) The North and South Ends of the Realty and respective related Improvements and Personalty, except to the extent a 42 percent interest in the Realty is being conveyed to the Trustee, are being conveyed to Rayburn and Forbes

respectively free and clear of liens and encumbrances other than liens for current taxes, easements and restrictions of record.[5]

In sum, following the division of the subject property into the North Property and South Property:

(a)  Walter agreed to relinquish any interest in the South Property to and in favor of Betty;

(b)  Betty agreed to relinquish any interest in the North Property to and in favor of Walter;

(c)  All parties agreed that the QTIP trustee would continue to have a 42-percent undivided interest in both the South Property and the North Property; and

(d)  Walter and Betty agreed to give each other mutual rights of first refusal over the South Property and the North Property for a period of twenty-one (21) years beginning October 7, 1988.

By quitclaim deed recorded October 13, 1988, the limited partnership conveyed to Betty, as to an undivided 58-percent interest, and to the QTIP trustee, as to an undivided 42-percent interest, all of its "right, title, and interest in and to" the

_____

[5] Although this paragraph of the termination agreement appears to indicate that the North Property and South Property were conveyed to Betty and Walter, respectively, other provisions of the termination agreement indicate the reverse.  The parties have stipulated that the South Property was conveyed to Betty and the North Property was conveyed to Walter, with the qualified terminable interest property (QTIP) trust retaining a 42-percent undivided interest in each property.

South Property.  By substantially identical quitclaim deed, the limited partnership conveyed to Walter and the QTIP trustee undivided 58-percent and 42-percent interests, respectively, in all of the limited partnership's "right, title, and interest" to the North Property.

In a letter dated October 7, 1988, Walter and Betty confirmed to the QTIP trustee the terms of the termination agreement.  The letter states that in consideration of the QTIP trustee's agreement that Betty shall have "the use of the entire South Property" and that Walter shall have "the use of the entire North Property", Betty and Walter each agree to pay any and all ad valorem taxes with respect to their respective parcels, for so long as the QTIP trustee should own any right, title, or interest in their respective parcels.

Property Held by the QTIP Trust at Decedent's Death

On December 26, 1993, the date of decedent's death, the QTIP trust held a 42-percent undivided interest in the South Property, a 42.9-percent interest[6] in the North Property, and two

---

[6] After 1988, in an isolated transaction between the QTIP trustee and Walter, the QTIP trust's interest in the North Property was increased to 42.9 percent and Walter's interest in the North Property was decreased to 57.1 percent.

promissory notes dated June 30, 1988, each in the amount of $225,371, one payable by Betty and the other payable by Walter.[7]

Decedent's Federal estate tax return reported the value of the QTIP trust's undivided interests in the North Property and the South Property, excluding any interest in the timber and pecan trees, as $519,000--predicated on an appraisal indicating that the fair market value of the entire 5,354 acres, taken as a whole, in fee simple and without regard to any valuation discounts, and without including timber or pecan trees, was $1,746,795, and that the value of the undivided interests should reflect a 30-percent fractional interest discount.

In the notice of deficiency, respondent determined that the QTIP trust's undivided interests in the subject property included beneficial interests in the timber and pecan trees, that the 5,354 acres had a fair market value of $7,045,800 at the date of decedent's death, and that the value of the QTIP trust's undivided interests in the property was $2,990,942. The notice of deficiency reduced the value of the QTIP trust's undivided interests by $450,742, reflecting the value of the two notes from Walter and Betty held by the QTIP trustee as consideration of the

---

[7] Pursuant to the termination of Malatchie Land Co., L.P. (the limited partnership) and Malatchie Farms (the general partnership), the promissory note from the general partnership to the QTIP trust was canceled and rewritten as two separate notes, each in the amount of $225,371, one from Betty and the other from Walter, each to the QTIP trust.

QTIP trustee's August 1, 1986, sale of the sole proprietorship assets to the general partnership. Respondent also determined that the QTIP trustee's sale of the sole proprietorship assets to the general partnership was for less than full and adequate consideration, giving rise to a $1,052,772 cause of action in decedent's favor, and increased her gross estate accordingly.

OPINION

A decedent's gross estate generally includes the value of all property interests described in sections 2033 through 2044. See sec. 2031; sec. 20.2031-1(a), Estate Tax Regs. Under section 2033, all property beneficially owned by the decedent at the time of death will be included in the gross estate. See sec. 20.2033-1(a), Estate Tax Regs. Section 2044 includes in the gross estate the value of all qualified terminable interest property (QTIP); i.e., property in which the decedent had a qualifying income interest for life and for which a deduction was allowed to the estate of a predeceased spouse under section 2056(b)(7). Upon the death of the second spouse, the QTIP is taxed as part of the second spouse's estate. See sec. 2044(c); sec. 20.2044-1(a), Estate Tax Regs.

Property includable in the gross estate is generally included at its fair market value at the time of death. See secs. 2031-2044. Fair market value is the price at which the property would change hands between a willing buyer and a willing

seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.  See United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

At decedent's death, the principal assets in the QTIP trust were:

(1) A 42-percent undivided interest in the 3,321 acres of the South Property and a 42.9-percent undivided interest in the 2,033 acres of the North Property; and

(2) the two notes from Walter and Betty, representing the consideration received by the QTIP trustee when he sold the sole proprietorship assets to the general partnership on August 1, 1986.

## The Parties' Contentions

On brief, respondent concedes that the QTIP trustee received full and adequate consideration for the sole proprietorship assets conveyed to the general partnership on August 1, 1986, and that accordingly decedent's estate does not include a right of action for a bargain sale of assets by the QTIP trustee.  The central dispute remaining, then, is the fair market value of the QTIP trust's undivided interests in the subject property, and more particularly, whether these interests include beneficial interests in the timber and pecan orchards on the subject property.

Petitioner argues that the gross estate should exclude the value of timber and pecan orchards on the subject property because the limited partnership, which quitclaimed the undivided interests to the QTIP trustee, had no beneficial interest in the timber and pecan orchards to convey.  Petitioner argues that when the limited partnership terminated in 1988 and conveyed the undivided interests in the subject property to the QTIP trust, it held at most "bare legal title" to the timber and pecan orchards, holding all beneficial ownership therein in implied resulting trusts for the benefit of Walter and Betty, who petitioner contends were the rightful owners.

Respondent's primary argument, raised for the first time on brief, is that the limited partnership was a sham and that the resulting trust doctrine is therefore inapplicable because the limited partners had "unclean hands".

As a general rule, this Court will not consider issues raised for the first time on brief where surprise and prejudice are found to exist.  See Sundstrand Corp. v. Commissioner, 96 T.C. 226, 346-347 (1991); Seligman v. Commissioner, 84 T.C. 191, 198 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 733-735 (1981).  Although the Court may affirm respondent's determinations for reasons other than those cited in the notice of deficiency, "the Court must determine whether there has been surprise and substantial

disadvantage to the petitioner in the presentation of his case because of the manner in which the statutory notice and pleadings were drawn". Estate of Horvath v. Commissioner, 59 T.C. 551, 555 (1973); see Mills v. Commissioner, 399 F.2d 744 (4th Cir. 1968), affg. T.C. Memo. 1967-67; Estate of Finder v. Commissioner, 37 T.C. 411 (1961).

Clearly, petitioner was surprised and prejudiced by respondent's posttrial contentions in this regard. Because neither the notice of deficiency nor the pleadings alerted petitioner to respondent's sham argument, petitioner was denied the opportunity to present evidence regarding it. Accordingly, we decline to consider respondent's sham argument first raised on brief. See Seligman v. Commissioner, supra.

In any event, even if we were to consider respondent's sham argument, it is not apparent how it would avail respondent. On reply brief, respondent contends that Mr. Forbes conveyed his land to the limited partnership so that his estate could claim a fractional discount with respect to its limited partnership interest.[8] Respondent's reply brief states: "The parties [i.e., Mr. Forbes, Walter, and Betty] did not really part with their property. There was no economic consequence to the conveyance to the partnership." Respondent's sham argument raises many

---

[8] The record does not conclusively establish how Mr. Forbes' estate valued his limited partnership interest for Federal estate tax purposes.

unanswered questions.  If, as respondent contends, Walter and Betty never parted with their interests in their 3,296 acres, how do we account for the fact that the QTIP trust held undivided interests in this acreage?--an undisputed fact upon which respondent's determinations are in significant part predicated. Moreover, if Mr. Forbes' 2,058 acres were never transferred to the limited partnership, it would appear from all the evidence that this acreage passed to the QTIP trust as part of Mr. Forbes' sole proprietorship and would have been sold by the QTIP trustee to the general partnership as part of the August 1, 1986, sale of all the sole proprietorship assets--a sale that respondent now concedes was for full and adequate consideration.[9]

In sum, respondent's sham argument comes too late and proves too much, suggesting that at decedent's death, the QTIP trust held <u>no</u> interest in the subject property--a position that even petitioner has not advanced.

---

[9] On brief, respondent suggests for the first time that the QTIP trustee's Aug. 1, 1986, sale of the sole proprietorship assets excluded the sole proprietorship's interests in growing timber and pecan orchards on the Forbes land.  This position appears inconsistent with respondent's position in his notice of deficiency that the Aug. 1, 1986, sale was a bargain sale from the QTIP trustee to Walter and Betty of timber worth $3,887,000, farm improvements worth $450,000, and farm equipment worth $145,550, and that decedent's gross estate should be increased to reflect a cause of action against the QTIP trustee for a bargain sale of assets.  As previously noted, respondent has now conceded that the sale was not a bargain sale and that decedent's gross estate includes no right of action against the QTIP trustee.

Implied Trusts

We apply Georgia State law to determine what interest the QTIP trust had in the South Property and North Property on the date of decedent's death. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967); Estate of Spruill v. Commissioner, 88 T.C. 1197, 1216 (1987). Because the QTIP trust obtained its two undivided interests in the subject property from the limited partnership by quitclaim deed, the QTIP trust received only such interest as the limited partnership possessed at the time of the conveyance. See Chatham Amusement Co. v. Perry, 117 S.E.2d 320, 325 (Ga. 1960).

Petitioner contends that when the limited partnership conveyed the undivided interests in the subject property to the QTIP trustee in 1988, the limited partnership held any beneficial interests in the timber and pecan orchards in implied resulting trusts in favor of Walter and Betty.

Determining Applicable Georgia Statutory Law

As a threshold matter, we must determine the appropriate Georgia statutory law to apply to the facts of this case. Effective July 1, 1991, chapter 12, regarding trusts, of title 53 of the Official Code of Georgia Annotated was repealed and reenacted to adopt the provisions of the Georgia Trust Act, which rewrote and reorganized the provisions of prior statutory law relating to implied trusts. The Georgia statutory law in effect

prior to July 1, 1991, expressly recognized implied trusts but did not expressly distinguish between implied resulting trusts and implied constructive trusts.[10]  The Georgia Trust Act provides separate treatment for resulting trusts, see Ga. Code Ann. sec. 53-12-91 (1997), and constructive trusts, see Ga. Code

-----

[10] Prior to July 1, 1991, Georgia statutory law provided (Ga. Code Ann. secs. 53-12-22 and 53-12-26 (1982)):

53-12-22. Distinction between express and implied trusts.

Trusts are either express or implied.  Express trusts are those trusts created and manifested by agreement of the parties.  Implied trusts are those trusts which are inferred by law from the nature of the transaction or the conduct of the parties.

53-12-26. Events and conditions giving rise to implied trust.

A trust is implied:

(1) Whenever the legal title is in one person but the beneficial interest, either from the payment of the purchase money or from other circumstances, is either wholly or partially in another;

(2) Where, from any fraud, one person obtains the title to property which rightly belongs to another;

(3) Where, from the nature of the transaction, it is manifest that it was the intention of the parties that the person taking the legal title should have no beneficial interest * * *

Ann. sec. 53-12-93 (1997).  The texts of these statutory provisions are set out in the margin.[11]

---

[11] The relevant sections of the Georgia Trust Act, as embodied in the Official Code of Georgia Annotated (1997), are as follows:

53-12-90. Implied trusts.

An implied trust is either a resulting trust or a constructive trust.

53-12-91. Resulting trusts.

A resulting trust is a trust implied for the benefit of the settlor or the settlor's successors in interest when it is determined that the settlor did not intend that the holder of the legal title to the trust property also should have the beneficial interest in the property, under any of the following circumstances:

(1) A trust is created but fails, in whole or in part, for any reason;

(2) A trust is fully performed without exhausting all the trust property; or

(3) A purchase money resulting trust as defined in subsection (a) of Code Section 53-12-92 is established.

53-12-93. Constructive trusts.

(a) A constructive trust is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity.

(b) The person claiming the beneficial interest in the property may be found to have waived the right to a constructive trust by subsequent ratification or long acquiescence.

In addition to expressly distinguishing between resulting trusts and constructive trusts, the Georgia Trust Act also appears to make other substantive changes to prior statutory law. We have discovered no authority addressing the application of the Georgia Trust Act to facts analogous to those here. For the reasons described below, we conclude that the Georgia Trust Act is inapplicable to the instant case.

The Georgia Trust Act provides that "Except to the extent it would impair vested rights and except as otherwise provided by law, this chapter shall apply to any trust regardless of the date it was created." Ga. Code Ann. sec. 53-12-3 (1997). Strictly speaking, it is unlikely at this point that Walter's or Betty's vested property rights would be impaired by application of the Georgia Trust Act or of any other provision of trust law, for after decedent died in 1994, the QTIP trust distributed its total interests in the subject property to Walter and Betty free of trust.

The question before us, however, is not what interests in the subject property Walter and Betty possessed after decedent's death, but rather what property interests the QTIP trust possessed immediately preceding decedent's death, which in turn depends upon the property interests held by the limited partnership in 1988 before it quitclaimed its property interests to the QTIP trustee, Walter, and Betty. More particularly, the

relevant question is whether the limited partnership held beneficial interests in the timber and pecan orchards on the subject property in implied trusts in favor of Walter and Betty. This question is meaningful only as it pertains to the period before the limited partnership terminated in 1988. After the limited partnership terminated and quitclaimed its interests in the subject property to the partners, any such implied trusts would have also terminated, since whatever beneficial interests the limited partnership might have held in implied trusts in favor of Walter and Betty would have merged with Walter's and Betty's respective legal interests in the subject property. We believe that when the Georgia Trust Act provides that it "shall apply to any trust regardless of the date it was created", Ga. Code Ann. sec. 53-12-3 (1997), it presupposes that the trust to which it is to apply is extant on or after the July 1, 1991, effective date of the Georgia Trust Act. It would be anomalous to apply the Georgia Trust Act retroactively to a trust that necessarily would have terminated, if it ever existed, before the enactment of the Georgia Trust Act. Accordingly, we conclude that the Georgia Trust Act is inapplicable and that Georgia statutory law as in effect no later than the date the limited partnership terminated--i.e., October 7, 1988--should govern. Cf. Major Realty Corp. v. Commissioner, 749 F.2d 1483, 1486 (11th Cir. 1985).

Analysis Under Pre-Georgia Trust Act Law

For the reader's convenience, we set out here once again the relevant Georgia statutory provision (Ga. Code Ann. sec. 53-12-26 (1982)) as in effect prior to adoption of the Georgia Trust Act:

> 53-12-26.  Events and conditions giving rise to implied trust.
>
> A trust is implied:
>
> > (1) Whenever the legal title is in one person but the beneficial interest, either from the payment of the purchase money or from other circumstances, is either wholly or partially in another;
> >
> > (2) Where, from any fraud, one person obtains the title to property which rightly belongs to another;
> >
> > (3) Where, from the nature of the transaction, it is manifest that it was the intention of the parties that the person taking the legal title should have no beneficial interest * * *

It has been stated that implied trusts arising under the first and third classifications in the statute above are generally considered resulting trusts, while those arising under the second classification are generally considered constructive trusts.  See Estate of Spruill v. Commissioner, 88 T.C. at 1217, (citing Hancock v. Hancock, 54 S.E.2d 385, 389 (Ga. 1949)).  As previously noted, however, the statute itself does not distinguish between resulting trusts and constructive trusts--a distinction that is often difficult but ordinarily unnecessary under this statute since "both are implied trusts and are

governed by the same rules." Hancock v. Hancock, supra. Consequently, although petitioner's case is predicated on the creation of implied resulting trusts upon creation of the limited partnership, the characterization of the implied trust as implied or constructive would appear to make little difference under this statute.

Under Georgia law, extrinsic evidence bearing on the parties' intent is admissible to establish the existence of an oral trust regarding land. See Harrell v. Harrell, 290 S.E.2d 906, 907 (Ga. 1982) (involving the substantially identical predecessor statute to Georgia Code section 53-12-26), in which the Georgia Supreme Court stated:

> circumstances may be offered as evidence of an intention (whether or not expressly articulated by each party) that title shall vest in one and beneficial ownership in the other. The scope of such evidence includes all of the facts and circumstances surrounding the transaction. The ultimate inquiry is whether there was, in truth, a mutual understanding, not whether such an understanding was expressed in plain and unambiguous terms.

The Georgia Supreme Court in Harrell acknowledged that "hidden beneficial ownership can be pernicious" and create uncertainty, but nevertheless concluded that the relevant statutory provisions "appear to sanction hidden trusts, and we must be guided by the law as given by the General Assembly." Id. at 907-908; see also McKinney v. Burns, 31 Ga. 295 (1860) (parol evidence was competent to establish, with regard to beneficial

interests in land, an implied trust in favor of a son-in-law who, without consideration and without relinquishing possession of the land, had executed a land deed to his father-in-law with the mutual understanding that the father-in-law would convey the land to the son-in-law's wife and children).

In Estate of Spruill v. Commissioner, supra, this Court applied these principles of implied trusts under Georgia law to conclude that an implied resulting trust arose in favor of a daughter and her husband with respect to a homesite where the facts clearly demonstrated an understanding among the parties that the daughter's father took legal title to the homesite for the sole purpose of obtaining financing on the property but enjoyed no beneficial interest in the property. Accordingly, this Court determined that the homesite was not includable in the father's gross estate. See also Estate of Rodriquez v. Commissioner, T.C. Memo. 1989-13 (applying Georgia law to hold that decedent's gross estate excluded beneficial interests in real property with respect to which decedent held legal title as the trustee of an implied resulting trust in favor of his closely held corporation, based on a mutual understanding that the closely held corporation was to have beneficial ownership).

Here, the totality of the evidence clearly shows a mutual understanding and intent that when Mr. Forbes, Walter, and Betty transferred their respective property interests to the limited

partnership in 1984, legal title would vest in the limited partnership but beneficial ownership of the timber, pecan orchards, and other growing crops would remain with the contributing limited partners individually. The undisputed evidence shows that the parties consistently treated their property interests as conforming to this mutual understanding. The limited partnership never conducted any business with regard to the timber, pecans, or other crops. Instead, after transferring his property to the limited partnership, Mr. Forbes continued to conduct his farming and timber business on the land he previously held, received all income therefrom, and reported all related income and deductions on his individual income tax returns. Similarly, Walter and Betty continued to receive and report individually all income from their farming and timber business on the land they had contributed to the limited partnership, creating the general partnership to conduct this business.

After Mr. Forbes' death, his executors conveyed to the QTIP trust, and the QTIP trustee immediately reconveyed to Walter and Betty, for consideration that respondent now concedes was full and adequate, the assets of Mr. Forbes' sole proprietorship. The general bills of sale by which these conveyances were accomplished expressly indicate that the conveyances included "All growing crops and timber on land owned by" the limited

partnership. The evidence indicates that the purchase price was computed consistently with this representation. Following this sale, the general partnership (i.e., Walter and Betty) managed all the assets, including the timber and pecan orchards, on the land held by the limited partnership and paid for all timber plantings on the land.

The termination agreement whereby the limited partnership and the general partnership were terminated in 1988 clearly indicates the parties' understanding that the limited partnership owned only the "Realty", defined in the termination agreement as the land itself and excluding, among other things, crops and trees, and that the general partnership owned the "Improvements and Personalty" thereon, defined in the termination agreement to include, among other things, timber, crops, and trees. The QTIP trust had a partnership interest in the limited partnership, but no interest in the general partnership between Walter and Betty. The termination agreement reflects the parties' intention that in distributing the assets of the two partnerships, Walter's and Betty's interests in their respective parcels would include both "Realty" and "Improvements and Personalty", whereas the QTIP trustee would receive only 42-percent undivided interests in the "Realty". After the termination of the partnerships, the QTIP trustee agreed to give Walter and Betty the "entire use" of their respective parcels in consideration for their payment of ad

valorem taxes thereon, with the relatively nominal consideration strongly suggesting that the QTIP trustee did not believe that the QTIP trust possessed rights to timber, pecan orchards, and other crops that would thereby have been transferred to Walter and Betty.

In sum, the evidence clearly manifests a mutual understanding that the limited partnership would hold legal title to the subject property but take no beneficial interest in the timber, pecan orchards, and other crops.[12] We conclude that under applicable Georgia law, the limited partnership held legal title to the land subject to implied trusts in favor of the limited partners with respect to beneficial interests in the timber, pecan orchards, and crops on the land. Because the limited partnership possessed no beneficial interests in the timber, pecan orchards, and other crops, in quitclaiming

---

[12] Without explanation, on reply brief respondent appears to concede this point by stating "no objection" to petitioner's following proposed finding of fact number 10:

> Mr. Forbes, Sr., did not agree to put the timber, pecan trees and growing crops on the land he owned in his name into * * * [the limited partnership]. He continued to own and manage those assets in his proprietorship company. He never put timber, pecan trees or growing crops into a partnership with Walter, Jr., and Betty Rayburn. * * *

Because respondent's apparent concession appears inconsistent with other positions in respondent's brief, however, we give it little weight and instead decide the issue on the merits as analyzed above.

interests in the subject property to the QTIP trust, it conveyed no such beneficial interests. Accordingly, we conclude and hold that on the date of decedent's death, the QTIP trust held no beneficial interest in the timber and pecan orchards on the subject land. Consequently, petitioner appropriately excluded the value of any such beneficial interests from decedent's gross estate.

Valuation Discount

The parties agree that on the date of decedent's death, the fair market value of the entire 5,354 acres of the subject property, taken as a whole, in fee simple and without regard to fractional interests, equitable claims of partners, or discounts, and without including timber or pecan trees, was $1,746,795. In reporting a $519,000 fair market value for the two undivided interests in the subject property on decedent's Federal estate tax return, petitioner took an allocable percentage of the $1,746,795 value and adjusted it downward by a 30-percent discount.

Respondent concedes that if the "tax-motivated sham" is disregarded, a fractional interest discount is appropriate. As previously discussed, we decline to consider respondent's untimely sham argument. Accordingly, in determining the value of decedent's undivided interests in the South Property and the

North Property, the only remaining issue is what fractional discount should apply.

Both parties rely on expert testimony to value decedent's undivided interests in the subject property. We evaluate expert opinions in light of all the evidence in the record and may accept or reject the expert testimony, in whole or in part, according to our own judgment. See Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Mellinger v. Commissioner, 112 T.C. 26, 39 (1999). "The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based." Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).

Petitioner presented testimony of two expert witnesses: Mr. James F. Lawton (Lawton) and Mr. Glen A. Hultquist (Hultquist).

Lawton determined that a fractional interest valuation discount is appropriate because the QTIP trust's undivided interests were minority interests and because the market for such interests would be restricted taking into consideration the limited pool of potential buyers, the likely difficulty of securing financing, and the likely costs of partitioning the two separate parcels. Lawton was unable to locate comparable sales, but he determined that in the market in which the subject property is located, real estate brokers had applied fractional interests of 10 percent to 30 percent in liquidating

partnerships. Based on this information, and taking into consideration the specific characteristics of the subject property, possible intra-family conflicts, and other factors adversely affecting the marketability of the two undivided interests in the subject property, Lawton concluded that a valuation discount of 30 percent is appropriate.

Hultquist, petitioner's other expert, concluded that the fair market value of the two undivided interests in the subject property as of decedent's date of death was $720,000, based on the correlated present value of net annual income streams that he projected from hypothetical partitions or forced sales of the subject property under various scenarios. Hultquist assumed that the QTIP trust's undivided interests included the value of pecan orchards but not the value of any timber. Because this assumption is contrary to our previous determination that the QTIP trust's undivided interests included no beneficial interest in the pecan orchards, his $720,000 estimate of discounted fair market value is of little utility.

Because Hultquist's $720,000 estimate of the discounted fair market value is approximately 36 percent less than what Hultquist assumed to be the undiscounted fair market value of the undivided interests in the subject property (again assuming that pecan orchards but not timber are included), petitioner argues that a 36 percent discount rate is appropriate. We disagree. We are

unconvinced that a discount rate extrapolated from one set of indicated values, under assumptions inapplicable here, would correspond to the discount rate extrapolated from a different set of indicated values if the underlying assumptions were altered. Moreover, even disregarding his faulty assumptions, Hultquist's present value computations are inadequately explained and justified, particularly in regard to the manner in which he derived the projected revenues from his hypothetical partitions or forced sales and the manner in which he derived his chosen 14 percent equity yield for purposes of his present value computations.

Respondent's expert, Mr. Richard Parks (Parks), purported to use a comparable sales approach to determine an appropriate valuation discount for a 42-percent undivided interest in the subject property. Parks indicated that because he was unable to locate minority interest sales in the market where the subject property is located, he had identified three other "appropriate examples" involving: (1) A 1989 sale of an office building in Birmingham, Alabama; (2) a 1961 sale of a 128-acre vacant tract in Jefferson County, Alabama; and (3) a 1981 sale of a 1,600-acre tract known as Bell Plantation (location not specifically identified but apparently somewhere outside of Georgia). These three "comparables" suggested discounts ranging from 25 percent to 64 percent. With little explanation, Parks concludes that

based on these examples and "other market oriented research completed by this appraiser" (not otherwise described by Parks), the appropriate discount rate is 18 percent.

We are unpersuaded that the "examples" on which Parks bases his comparable sales analysis actually represent comparable sales. Even if they did, we find no adequate justification for his selection of an 18-percent discount rate--a rate that is well below the smallest discount indicated by Parks' own "comparables". Consequently, we do not rely on Parks' report. See Rule 143(f)(1).

We are unsatisfied that any of the parties' experts have adequately justified their recommended discount rates--a shortcoming that might be attributable in part to a lack of available empirical data. Given that the parties agree that some valuation discount is appropriate, however, and lacking any firm basis on which we might independently derive one, we accept Lawton's recommended 30-percent valuation discount as being the most reasonably justified of the opinions presented to us. This is the same discount rate that petitioner used in reporting the value of the undivided interests for Federal estate tax purposes.

Accordingly, all valuation issues in dispute having been determined in petitioner's favor, we conclude that petitioner correctly reported the fair market value of the QTIP trust's undivided interests in the subject property as $519,000.

Section 6662(g) Penalty

There being no estate tax valuation understatement, respondent's assertion of a penalty under section 6662(g) is not sustained.

To reflect the foregoing and to permit petitioner to claim additional administrative expenses pursuant to section 2053,

Decision will be

entered under Rule 155.