T.C. Memo. 2002-152


UNITED STATES TAX COURT


ESTATE OF LEWIS A. BAILEY, DECEASED, FRANCES JEANETTE FOSTER,
EXECUTRIX, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15005-99.                    Filed June 17, 2002.


James Allen Brown, for petitioner.

William F. Castor, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


THORNTON, Judge:  Respondent determined a $119,731 Federal estate tax deficiency with respect to the estate of Lewis A. Bailey (the estate).  After concessions, the issues for decision are:  (1) The date-of-death value of decedent's 25-percent interest in C&L Bailey, Inc. (C&L Bailey); (2) the date-of-death value of a 25-percent interest in C&L Bailey that was held in a

qualified terminable interest property (QTIP) trust established by decedent's predeceased first wife and that is includable in decedent's gross estate pursuant to section 2044; (3) the amount, if any, of net taxable gifts arising with respect to the 1995 assignment to decedent's children of a promissory note; (4) the amount, if any, of decedent's unreported taxable gifts in 1993 and 1989; and (5) the amount deductible under section 2053(a)(2) as administration expenses of the estate.[1]

## FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate, along with the associated exhibits, into our findings.

Decedent

Lewis A. Bailey (decedent) died on December 18, 1995. His domicile at death was in Garland County, Arkansas. When the petition was filed, the executrix resided in Hot Springs, Arkansas.

C&L Bailey

In 1985, decedent and his wife, Ethel C. Bailey (Ethel), incorporated C&L Bailey, an Arkansas nonpublicly traded

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

corporation. Initially, they each owned one half of the 300 outstanding shares of C&L Bailey stock.

In 1989, Ethel died. Her 150 shares of C&L Bailey stock passed to the Ethel C. Bailey Trust (the trust). Pursuant to section 2056(b)(7), her estate elected to treat 50 of these shares as QTIP property, giving decedent the right for life to all income from the 50 shares. Under the trust, each of decedent's and Ethel's six children received a one-sixth residual interest in the 50 shares of QTIP election property and also in the other 100 shares of C&L Bailey stock held in the trust.

Between 1985 and 1993, decedent gave some of his C&L Bailey stock to relatives. The gifts included two shares each to his son Roger Bailey (Roger), his daughter Frances Jeanette Foster (Frances), and his daughter-in-law Lillian Bailey (Lillian). Between 1989 and 1993, C&L Bailey redeemed 100 shares of its stock at $5,000 per share. These redemptions included all the stock that decedent had given to relatives and all but 50 of decedent's shares of C&L Bailey stock. Consequently, at decedent's death, there were outstanding 200 shares of C&L Bailey stock, 50 shares (25 percent) of which decedent owned outright and 150 shares (75 percent) of which were held in the trust.

At decedent's death, C&L Bailey's principal assets were two motels that it owned and operated (the motels): (1) An Econo Lodge Motel in Hot Springs, Arkansas (the Arkansas motel); and

(2) a Quality Inn in Ridgecrest, California (the California motel). Decedent's grown children managed the motels.

The California motel was located on two parcels of land. One of these parcels (parcel 1) was owned by C&L Bailey. The other parcel (parcel 2) was titled to decedent and Ethel jointly as to an undivided one-half interest and to C&L Bailey as to the remainder. After Ethel's death, decedent owned an undivided one-half interest in parcel 2.

After providing for certain specific bequests that are not relevant here, decedent's will directed that the residue of his estate, including all real and personal property, would go in equal shares to three of his and Ethel's six children; namely, Frances, Roger, and Harold Lewis Bailey (Harold).

Assignment of Promissory Note

On February 19, 1993, decedent created the Lewis A. Bailey Family Trust, a revocable grantor trust (the grantor trust). Decedent was the trustee. The corpus of the grantor trust was composed of certain of decedent's separate property, including real property located at Lake Catherine, Route 6, Box 870, Hot Springs, Arkansas (the Lake Catherine property). Pursuant to the terms of the grantor trust agreement, the grantor trust was to terminate upon decedent's death, with all the trust assets to be distributed equally to decedent's six children.

Attached to and made part of the grantor trust agreement was an antenuptial agreement that decedent and his second wife-to-be, Melba J. Bushnell (Melba), had executed in 1991 (the antenuptial agreement). The antenuptial agreement stated that decedent and Melba would each retain separate control of property they had acquired before their marriage, "the same as if the marriage relationship did not exist". The antenuptial agreement identified as decedent's separate property virtually the same property (including the Lake Catherine property) that later became the corpus of the grantor trust. In the antenuptial agreement, decedent and Melba agreed:

> should either party desire to * * * sell, or otherwise convey * * * his or her separate property now owned and acquired before the marriage of the parties, * * * the other hereby covenants to join in any conveyance or other instrument as may be necessary to make the transfer * * * effectual and satisfactory to any third party; provided, however, that by joining in such conveyance * * *, the party so joining pursuant to this Agreement does not acquire any interest in the profits or other benefits from the transaction * * *.

On December 14, 1994, decedent executed a revocation of the grantor trust; on February 1, 1995, the revocation was filed.

Prior to the revocation of the trust, on January 31, 1994, Neil and Allison Maness (the Manesses) executed a $148,700 promissory note (the promissory note) in favor of the grantor trust. Exactly a year later, on January 31, 1995, decedent and Melba executed a warranty deed conveying the Lake Catherine property to the Manesses. The warranty deed recited that this

real property was previously held in the grantor trust, "which Trust was revoked by Grantor before this conveyance."   Also on January 31, 1995, decedent and Melba executed an assignment of the promissory note to three of decedent's children (Harold, Roger, and Frances).

Decedent's Estate Tax Return

C&L Bailey Stock

On Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, Schedule B--Stocks and Bonds, the value of decedent's 50 shares of C&L Bailey stock was reported as $370,708.  Similarly, on Schedule F--Other Miscellaneous Property Not Reportable Under Any Other Schedule, the value of the 50 shares included in decedent's gross estate as QTIP property was reported as $370,708.  Supporting schedules attached to the Form 706 indicate that $370,708 represents 25 percent of an indicated $2,965,662 total "liquidation value" of the two motels, after applying a 50-percent discount, described on the schedules as a "Key Man, Minority Ownership, Lack of Market Discount".

The $2,965,662 total "liquidation value" of the two motels (as indicated on the schedules to decedent's Form 706) represented the estimated value of C&L Bailey's assets (primarily the California motel and the Arkansas motel) net of corporate liabilities.  For this purpose, the estimated value of the motels was based on two appraisal reports:  (1) A May 1996 report (the

original Biles report), prepared by Ralph W. Biles, an Arkansas State certified general appraiser, appraising the fair market value of the Arkansas motel to be $2,380,000; and (2) a March 1996 report (the Ohrmund report), prepared by Ronald D. Ohrmund, a California certified general appraiser, appraising the fair market value of the California motel to be $1,388,000.

When the estate tax return was filed, the executor of decedent's estate was unaware of decedent's individual one-half ownership interest in parcel 2. Consequently, this asset was not separately reported on the estate tax return. Similarly, decedent's one-half ownership interest in parcel 2 was not taken into consideration in the Ohrmund report's valuation of the California motel or otherwise reflected in the valuation of decedent's C&L Bailey shares as reported on Form 706.

### The Promissory Note

On decedent's estate tax return, the $148,700 promissory note was listed on Schedule E--Jointly Owned Property, as decedent's and Melba's joint property; consequently, a one-half interest in the promissory note ($74,350) was reported as being included in decedent's gross estate.

### Notice of Deficiency

On or about June 13, 1997, respondent commenced the examination of decedent's estate tax return. On July 2, 1999, respondent issued the notice of deficiency.

C&L Bailey Stock

In the notice of deficiency, respondent determined that the date-of-death value of decedent's 50 shares of C&L Bailey stock was $451,263, rather than $370,708, as shown on decedent's estate tax return. Similarly, respondent determined that the date-of-death value of the 50 shares of C&L Bailey stock includable in decedent's estate as QTIP property under section 2044 was $451,263.

In determining these values, respondent relied upon an October 1996 valuation report (the original Smith report) that had been prepared for the trust by Dennis C. Smith (Smith), a certified public accountant and certified valuation analyst in Hot Springs, Arkansas. The original Smith report concluded that the total, undiscounted fair market value of C&L Bailey as of the date of decedent's death was $3,610,200, or $18,051 per share. Applying a 25-percent marketability discount to this indicated value, the original Smith report concluded that the date-of-death value of decedent's 50 shares of C&L Bailey stock was $13,358 per share.

In the notice of deficiency, respondent adopted Smith's conclusions, but increased Smith's 25-percent discount rate by an additional 25 percent, to match the 50-percent combined discount reflected on the estate tax return. Applying this 50-percent discount to the values indicated by the original Smith report,

respondent determined that the value of decedent's 50 shares of C&L Bailey stock was $9,025 per share, yielding the $451,263 total value determined in the notice of deficiency. Respondent used the identical approach in valuing at $451,263 the 50 shares of C&L Bailey stock includable in the gross estate under section 2044.

### The Promissory Note

In the notice of deficiency, respondent determined that decedent's estate tax return improperly treated the promissory note as decedent's and Melba's jointly owned property and improperly reported a half interest in the note as includable in the gross estate; accordingly, respondent reduced the gross estate by $74,350. Respondent further determined that upon assignment of the promissory note to three of his children in 1995, decedent had made three taxable gifts totaling $118,700 (after allowance for three $10,000 annual exclusions).

### Other Taxable Gifts

In the notice of deficiency, respondent also determined that decedent had made unreported taxable gifts of $20,000 and $10,000 in 1989 and 1993, respectively. The notice of deficiency contains no other explanation of this determination or description of the alleged unreported gifts or of the alleged donees.

Sale of the California Motel

After decedent's death, an attempt was made to sell the California motel. In 1999, a buyer was found for the property. Before the sale could be consummated, a preliminary report from the title company disclosed decedent's one-half interest in parcel 2. A California probate proceeding was instituted. In a January 21, 2000, order determining succession to real property, the Superior Court of Kern County, California, found and ordered that Frances, Roger, and Harold each had a one-third interest in what had been decedent's one-half interest in parcel 2.

To clear up the title and facilitate sale of the California motel, Frances executed a grant deed, conveying her interest in parcel 2 to C&L Bailey. Similarly, Roger and Harold each executed quitclaim deeds, conveying their interests in parcel 2 to C&L Bailey. The grant deed and quitclaim deeds each stated identically that the "Documentary transfer tax is $ NONE-TO CLEAR UP TITLE".

On March 15, 2000, the grant deed and two quitclaim deeds were filed in Kern County, California. On the same date, there was filed in Kern County, California, a corporation grant deed, executed February 11, 2000, whereby C&L Bailey conveyed parcel 2 to the purchaser of the California motel, Grewal Hotels, Inc.

OPINION

A. Valuation of Decedent's 50 Shares of C&L Bailey Stock

The value of a decedent's gross estate includes "the value at the time of his death of all property, real or personal". Sec. 2031(a). The relevant value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs; see United States v. Cartwright, 411 U.S. 546, 551 (1973). See generally Rev. Rul. 59-60, 1959-1 C.B. 237. The fair market value of property reflects its highest and best use on the valuation date. Mitchell v. United States, 267 U.S. 341, 344-345 (1925); Frazee v. Commissioner, 98 T.C. 554, 563 (1992); Symington v. Commissioner, 87 T.C. 892, 896 (1986).

The parties disagree about the date-of-death value of decedent's 50 shares of C&L Bailey stock. They also disagree about the value of the 50 shares of QTIP property includable in decedent's gross estate under section 2044. It is undisputed that the 50-share blocks are valued independently of each other rather than aggregated. See Estate of Mellinger v. Commissioner, 112 T.C. 26 (1999). The parties have, as a threshold matter, focused on the value of the 50 shares that decedent owned outright, agreeing that the value of this 50-share block will

govern the value of the other 50-share block.  We proceed likewise in our analysis.

Valuation of stock for tax purposes is a matter of "pure fact" and one to be decided by considering all circumstances connected with the corporation; there is no one universally applicable formula.  Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; see Estate of Goodall v. Commissioner, 391 F.2d 775, 786 (8th Cir. 1968), affg. in part and revg. in part T.C. Memo. 1965-154.

Respondent, who determined in the notice of deficiency that the value of decedent's 50 shares of C&L Bailey stock was $451,263, now contends that the value is $415,319.  Petitioner, who originally reported the value of the 50 shares as $370,708, contends on brief that the value is only $194,565.

In support of their positions, each party relies on expert testimony.  We evaluate expert opinions in light of all the evidence in the record and may accept or reject expert testimony, in whole or in part, according to our own judgment.  See Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Estate of Ford v. Commissioner, 53 F.3d 924, 927 (8th Cir. 1995), affg. T.C. Memo. 1993-580; Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Shepherd v. Commissioner, 115 T.C. 376 (2000), affd. 283 F.3d 1258 (11th Cir. 2002).

Respondent's Expert

Respondent's expert, Smith, valued decedent's C&L Bailey stock on the basis of the adjusted book value of the corporation's net assets.[2]  In doing so, he adopted without change the appraised values of the California motel and the Arkansas motel as reflected in the Ohrmund report and the original Biles report, respectively.  Like the Ohrmund report, Smith's report makes no adjustment in the California motel value for decedent's individual one-half ownership interest in parcel 2.  In determining a $415,319 value for decedent's 50 shares of C&L Bailey stock, Smith allowed a 20-percent minority-interest discount and a 27.44-percent discount for lack of marketability.

Petitioner's Experts

Petitioner offered two expert witnesses:  (1) Richard L. Schwartz (Schwartz), who is a certified public accountant and certified business appraiser; and (2) Biles, who, as previously discussed, is the Arkansas appraiser who prepared the original Biles report valuing the Arkansas motel.

Like Smith, Schwartz valued decedent's C&L Bailey stock by reference to the adjusted book value of the corporation's net assets.  Like Smith, Schwartz adopted the appraised value of the

_____

[2] As previously discussed, Dennis C. Smith (Smith) also prepared the October 1996 valuation report from which respondent derived the C&L Bailey stock values reflected in the notice of deficiency.

Arkansas motel as reflected in the original Biles report. Like Smith, in valuing the California motel, Schwartz used the Ohrmund report's appraised value as a starting point; unlike Smith, Schwartz adjusted this value downward by $193,000 to reflect decedent's individual ownership interest in parcel 2. Schwartz concluded that the value of decedent's 50 shares of C&L Bailey stock was $307,100. Like Smith, Schwartz allowed a 20-percent minority-interest discount. Unlike Smith, Schwartz allowed a 40-percent (instead of a 27.44-percent) marketability discount.

Petitioner's other expert, Biles, did not undertake to value decedent's 50 shares of C&L Bailey stock but instead performed a "desk review" of the Ohrmund report's appraisal of the California motel. In his report (the Biles report), Biles concluded that the value of decedent's individual ownership interest in parcel 2 was $64,100. Biles also concluded that the value of the California motel was only $819,180.

On brief, to derive the $194,565 asserted value for decedent's 50 shares of C&L Bailey stock, petitioner generally follows Schwartz's valuation methodology and conclusions but substitutes Biles' valuation of the California motel into Schwartz's analysis.

As reflected in the preceding discussion, Smith and Schwartz agree about a number of fundamental issues in valuing the C&L Bailey stock. They agree that decedent's 50 shares of C&L Bailey

stock should be valued on the basis of the adjusted book value of the corporation's net assets.  In determining the adjusted value of the motels (which make up almost all the assets of C&L Bailey), they have both used, as a starting point, the Ohrmund appraisal report's valuation of the California motel and have both adopted the original Biles report's appraisal value of the Arkansas motel.  They agree that a 20-percent minority interest discount is appropriate and that some additional marketability discount is appropriate.

After concessions by respondent,[3] the parties and their experts disagree primarily about these three issues:  (1) The value of the California motel at decedent's death, and in particular, the effect of decedent's individual one-half ownership interest in parcel 2 on the value of his 50 shares of C&L Bailey stock; (2) whether a $145,000 shareholder liability reflected on C&L Bailey's yearend 1995 corporate books represented a valid debt that should be included as a negative item in determining C&L Bailey's net assets; and (3) the total discount that should be allowed in valuing decedent's 50 shares of C&L Bailey stock.  We address each of these issues in turn.

---

[3] Respondent concedes that C&L Bailey's assets should exclude certain assets reported on the corporation's yearend 1995 balance sheets; namely, a $16,316 corporate loan to stockholders and a $19,000 franchise fee asset.

Valuation of The California Motel

### The Ohrmund Report

In valuing the California motel, all the experts start with the Ohrmund report. Accordingly, we start there too. The Ohrmund report concluded that the December 18, 1995, value of the California motel was $1,388,000. The Ohrmund report states that the appraisal of the property "has been made with the understanding that the present ownership of the subject property includes all rights that may be lawfully owned, and therefore, title in 'fee simple'." Consequently, in valuing the California motel, the Ohrmund report did not consider any effect of decedent's one-half ownership interest in parcel 2.

The Ohrmund report employed three methods of estimating the market value of the California motel: the cost approach, the sales comparison approach, and the income approach, which yielded value indications of $1,100,000, $1,374,000, and $1,400,000, respectively.[4] The Ohrmund report correlated these three values to reach its final estimate of $1,388,000.

### Respondent's Expert

Smith adopted the Ohrmund report's $1,388,000 value for the California motel.

---

[4] To reach the $1,374,000 value indicated by the income approach, the Ohrmund report applied a capitalization rate of 13.5 percent to estimated annual net income of $192,536.

Petitioner's Experts

Schwartz also utilized the Ohrmund report's $1,388,000 valuation of the California motel; in a footnote, however, Schwartz indicated, without elaboration, that he had adjusted the value of C&L Bailey's assets downward by $193,000 to reflect "the land originally owned by C&L Bailey, Inc., but discovered to be owned by" decedent.

In his "desk review" of the Ohrmund report, Biles accepted the Ohrmund report's conclusion that the combined value of parcels 1 and 2 was $250,000 and sought to allocate this value between the two parcels. Using the commercial land sales comparables contained in the Ohrmund report, Biles concluded that the value of parcel 1, as a stand-alone asset, was $185,895. Biles then concluded that the $64,105 "residual value" represented the value of parcel 2, which he concluded should be treated as decedent's separate property.

In his "desk review", Biles faulted the Ohrmund report for failing to give appropriate weight to a number of economic factors cited therein, including a downturn in the Ridgecrest, California, motel market. The Biles report also faulted the Ohrmund report for failing to consider a "'QUICK SALE VALUE' which, based on the review appraiser's [i.e., Biles'] knowledge of the NEED TO SETTLE THE ESTATE, should have been a MAJOR FACTOR in the FINAL ESTIMATED VALUE". (Idiosyncratic typography in

original.)  The Biles report noted that the California motel could have been classified as a property with a "discrepancy" in the title.  The Biles report concluded that if all these factors were properly considered, the California motel should be valued based on "'Rates and Terms' of A 'DISTRESS SALE', with added consideration being given to the 'clouded title' of the land".  (Idiosyncratic typography in original.)  The Biles report stated, with little elaboration, that on the basis of all this information and discussions with lenders in the local market, the proper capitalization rate to use in applying the income valuation method was 15.5474 percent, rather than the 9.846 percent indicated by the Ohrmund report.  Biles also concluded that the Ohrmund report had overstated net income from the California motel by underestimating the ratio of expenses to gross income as 60 percent; with little elaboration, Biles concluded that a 75-percent expense ratio was more appropriate.  After making this adjustment, Biles concluded that the annual net income from the California motel was only $127,361, rather than the $192,536 indicated by the Ohrmund report.  Factoring in his upwardly adjusted capitalization rate and his downwardly adjusted net income figure, Biles concluded that the "discounted value" of the California motel was only $819,200, rather than $1,388,000, as indicated by the Ohrmund report.

## Our Valuation of the California Motel

At his death, decedent owned both a one-half undivided interest in parcel 2 and 50 shares of C&L Bailey stock. C&L Bailey, in turn, owned the other half of parcel 2, as well as the motel that sat upon it. The estate, being initially unaware of decedent's individual ownership interest in parcel 2, inadvertently omitted this asset from decedent's gross estate on the estate tax return. Petitioner now contends that this inadvertent omission should be cured by increasing decedent's gross estate by $64,100, on the basis of Biles' determination of the date-of-death value of decedent's ownership interest in parcel 2. At the same time, petitioner contends, the value of the 50 shares of C&L Bailey stock included in decedent's gross estate should be reduced from $370,708 (as reported on the estate tax return) to $194,565, to reflect the "title problem" that petitioner contends reduced the value of the California motel from $1,388,000 (as indicated by the Ohrmund report, on which the relevant values reported on the estate tax return were predicated) to $819,000 (as determined by Biles).

We are unpersuaded by petitioner's contentions. In the first instance, Biles' conclusion that decedent's ownership interest in parcel 2 should be valued at $64,100 appears based on an erroneous assumption that decedent owned all of parcel 2. In fact, decedent owned only a one-half undivided interest in parcel

2--an ownership interest that cannot reliably be assumed to have a value equal to one-half the value of the whole.

More fundamentally, we are unpersuaded by Biles' conclusion that the California motel should be valued at $819,000.[5]  As previously discussed, the primary focus of Biles' "desk review" was the Ohrmund report's application of the income method and, in particular, its indicated capitalization rate and net income figures.  The reasons Biles gives in support of his adjustments to the Ohrmund report are highly conclusory and lacking in analytical support.  For instance, Biles' downward adjustment of the California motel's value on account of the alleged need of decedent's estate to make a "distress sale" to settle the estate (an otherwise unsubstantiated factual premise) is inconsistent with the concept of fair market value as determined by reference to a hypothetical willing buyer and willing seller.  "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell * * *.  The fair market value * * * is not to be determined by a forced sale price."  Sec. 20.2031-1(b), Estate Tax Regs.

---

[5] Although petitioner seems to suggest that Biles' downward adjustment of the $1,388,000 Ohrmund report valuation resulted from Biles' consideration of decedent's individual ownership interest in parcel 2, Biles' report clearly indicates that this was just one of several factors that entered into his analysis. Although Biles mentions the parcel 2 title problem, he does not separately identify its effects upon his final conclusions.

We are unconvinced that Biles, an Arkansas appraiser who performed only a "desk review" of the Ohrmund report and who testified that he had never even spoken with Ohrmund about it, was in a better position that Ohrmund, a California appraiser, to make the key economic assumptions required for applying the income approach in valuing the California motel. Indeed, leaving aside faulty assumptions regarding the ownership of parcel 2 (a matter in which the Ohrmund report and the Biles report are both guilty, though differently), we generally found the Ohrmund report to be better explained, better supported, and more convincing than Biles' "desk review" of it. Both petitioner's other expert, Schwartz, and respondent's expert, Smith, utilized Ohrmund's report without expressing any reservations as to its methodology.

In sum, we are unpersuaded by Biles' conclusion that the value of the California motel was only $819,000.[6] Although it may be true, as petitioner contends, that the divided ownership of parcel 2 impaired the value of the California motel to some degree, Biles' report--which does not purport to separately identify the effects of the "clouded title" on the California

---

[6] Even if we were to assume, for sake of argument, that the Biles report appropriately adjusted the Ohrmund report's application of the income method of valuation, the Biles report nevertheless fails to address the two other valuation methods (the sales comparison method and cost method) that the Ohrmund report also applied and correlated in reaching its final valuation estimate.

motel valuation--provides no meaningful assistance in measuring any such impairment of value. Nor does the record otherwise provide a reliable basis for estimating any such impairment of value.[7]

Moreover, if we were to assume, for sake of argument, that the gross estate, as determined by respondent (and as reported on decedent's estate tax return), should be adjusted downward to reflect some impairment to the value of decedent's C&L Bailey stock resulting from the divided ownership of parcel 2, it would follow (as petitioner concedes) that decedent's gross estate should be correspondingly increased to reflect decedent's inadvertently omitted individual ownership interest in parcel 2. Petitioner has not shown that the net result of these correlative adjustments would be to the estate's advantage. To state the problem more precisely, petitioner has not shown that ignoring any such title-related impairment to the value of the California motel resulted in an overstatement of decedent's gross estate greater than the understatement of the gross estate that resulted from the omission of decedent's individual ownership interest in

_____

[7] As previously discussed, Schwartz deviated from the Ohrmund report in making a $193,000 downward adjustment to reflect the divided ownership of parcel 2. Schwartz, however, offered no explanation or support for this downward adjustment. Consequently, his report is of little assistance in measuring the effect of the "clouded title" of parcel 2 on the value of the California motel. Petitioner has not argued that we should rely on Schwartz's conclusion in this regard.

parcel 2.[8]  In these unusual circumstances, where decedent himself was the only potential adverse claimant with respect to the parcel 2 title defect that petitioner contends decreased the value of decedent's 50 shares of C&L Bailey stock, and on this record, we have no reasonable basis for estimating the amount of any resulting net decrease in the value of decedent's gross estate.[9]

---

[8] Because decedent's gross estate included only a total 50-percent interest in C&L Bailey (the sum of the 25-percent interest that decedent owned outright and the 25-percent interest includable under sec. 2044 as QTIP property), his estate would realize only a proportional benefit from any decrease in the value of the California motel, further limited by any applicable valuation discount utilized in determining the value of his C&L Bailey shares.  On the other hand, the gross estate should reflect the full value of decedent's individual ownership interest in parcel 2.  For example, assuming that a 50-percent combined valuation discount is applicable (to foreshadow our eventual holding in this regard), a hypothetical $100,000 title-related decrease in the value of the California motel would result in only a $25,000 decrease (($100,000 x (1-.5)) x .5) in the gross estate.  If the value of decedent's ownership interest in parcel 2 were determined to be at least $25,000 and included in decedent's gross estate, the estate would realize no net benefit from these adjustments.  Stated another way, any title-related impairment to the California motel value would have to exceed the value of decedent's individual ownership interest in parcel 2 by at least a factor of 4 before disregarding these unequal and opposite valuation effects (as in respondent's determination) would result in any net detriment to the estate. The record contains no basis for reliably quantifying such asymmetrical valuation effects.

[9] In reaching this result, it is unnecessary for us to consider, and we do not attempt to resolve, conceptual issues as to whether decedent's potentially self-opposing interests in parcel 2 (as the individual owner of a one-half interest therein, on the one hand, and as a 25-percent stockholder of C&L Bailey, on the other hand) should be considered separately so as to

(continued...)

Accordingly, we hold that for purposes of valuing decedent's 50 shares of C&L Bailey stock, the value of the California motel is appropriately estimated at $1,388,000. Taking into consideration that respondent has not determined that the estate erred by excluding decedent's one-half ownership interest in parcel 2 from the gross estate as reported on the estate tax return, and seeking to avoid possible double counting, we hold further that decedent's gross estate includes no separate value attributable to decedent's individual ownership interest in parcel 2.

## The $145,000 Shareholder Liability

C&L Bailey's December 31, 1995, balance sheet reported a $145,000 liability for "Loans from shareholders". In determining

---

[9](...continued)
reduce the value of his total assets or should be viewed in the aggregate to reflect the economic reality that decedent would be unlikely to act adversely to his own economic interests. In this latter regard, however, we observe that a hypothetical seller in decedent's shoes, rather than sell the 50 shares of C&L Bailey stock at a bargain-basement price on account of the divided ownership of parcel 2, might reasonably be expected to relinquish the individual ownership interest in parcel 2 to clear the title and thereby preserve the stock's value. The evidence strongly suggests that this is precisely what decedent's heirs did: shortly after the title defect was discovered in the course of C&L Bailey's attempted sale of the California motel to a third party, Frances, Roger, and Harold each deeded over to C&L Bailey, apparently without consideration, their one-third interests in decedent's one-half interest in parcel 2. Although we do not predicate our holding on these postdeath events, we believe they are usefully considered for the limited purpose of illuminating expectations that a hypothetical willing buyer and seller might reasonably have entertained as of the date of decedent's death. See Estate of Gilford v. Commissioner, 88 T.C. 38, 52-53 (1987); Estate of Jephson v. Commissioner, 81 T.C. 999, 1002 (1983).

C&L Bailey's net assets for purposes of appraising the value of decedent's C&L Bailey stock, Smith reclassified this $145,000 liability item as paid-in capital (thereby increasing C&L Bailey's indicated net assets).  Respondent's determination reflects this adjustment.  Petitioner contends it is erroneous.

The only evidence that petitioner points to as substantiating the alleged $145,000 liability is an entry on decedent's Schedule C--Mortgages, Notes, and Cash, of Form 706, for "NOTE RECEIVABLE - C&L BAILEY, INC.", in the amount of $140,000.   Petitioner alleges that $140,000 was the balance of the liability as of December 31, 1995.  On brief petitioner states:  "If the loan is not a valid obligation as argued by Mr. Smith, then it would be proper to adjust the Gross Estate as shown of [sic] Form 706 * * * to remove this asset[.]  Removal from the gross estate would provide a greater benefit to the Petitioner but it would not be correct."

Because the record does not reliably substantiate the alleged $145,000 liability, we sustain respondent's determination that it should be excluded from the calculation of C&L Bailey's net assets.  We also conclude that the $140,000 note receivable from C&L Bailey should be excluded from decedent's gross estate.  As petitioner observes, the net result is to petitioner's advantage.

Valuation Discount

As reported on the estate tax return, the value of decedent's 50 shares of C&L Bailey stock reflected a total 50-percent discount. In the notice of deficiency, respondent applied the same 50-percent total discount in valuing the stock. In this proceeding, however, the parties' seeming harmony on this score has modulated to a discord of contending experts. Although the parties and their experts agree that a 20-percent minority discount is appropriate and that some additional marketability discount is appropriate, they disagree about the amount of the marketability discount. Petitioner contends it should be 40 percent (thus suggesting a combined valuation discount of 52 percent, after taking into account the agreed 20-percent minority discount).[10] Respondent, on the other hand, contends that the marketability discount should be only 27.44 percent (thus suggesting a combined valuation discount of 41.95 percent).

---

[10] On brief, without explanation or discussion, petitioner treats the agreed-upon 20-percent minority discount and the asserted 40-percent marketability discount as being additive, resulting in a claimed combined discount of 60 percent (20 percent + 40 percent), rather than multiplicative, which would result in a combined discount of 52 percent (20 percent + (40 x (1-.20) percent). Although the result reached herein does not depend upon the distinction, we note that as a general proposition the application of a minority discount and discount for marketability is multiplicative rather than additive. See Trugman, Understanding Business Valuation: A Practical Guide to Valuing Small to Medium-Sized Businesses 286 (1998).

Petitioner's Expert

Petitioner's expert, Schwartz, based his recommended 40-percent marketability discount on various studies of restricted stocks and on various studies analyzing "the relationship between the prices of companies whose shares were initially offered to the public (IPO) and the prices at which their shares traded privately within a short period immediately preceding the public offering."  Schwartz concluded that these various studies indicated a "reasonable range" for a marketability discount between 35 and 50 percent.  In valuing the C&L Bailey stock, Schwartz selected a marketability discount of 40 percent as being somewhat below the midpoint of this indicated range.

The restricted stock studies that Schwartz relied upon analyzed stocks that had a holding period of 2 years or less. The record contains no evidence, however, to support an assumption that an investor in C&L Bailey would likely have such a short-term investment horizon.  To the contrary, the evidence in the record strongly suggests that since the inception of C&L Bailey, there has been no trading of its shares, suggesting that the hypothetical willing buyer who is representative of prospective investors in C&L Bailey might well have a longer investment horizon than the investors of the restricted stocks analyzed in the studies.  Moreover, the restricted stock studies that Schwartz relies upon analyzed, at least in part, the

restricted stock of publicly traded corporations.[11]  C&L Bailey

is not a publicly traded corporation.  Consequently, we are

unpersuaded that Schwartz appropriately relied on these

restricted stock studies in deriving his recommended 40-percent

marketability discount.  See Furman v. Commissioner, T.C. Memo.

1998-157; Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd.

91 F.3d 124 (3d Cir. 1996).

Respondent's Expert

Smith's recommended 27.44-percent marketability discount

represents the sum of his recommended 21.44-percent discount for

the tax on built-in gains of C&L Bailey's assets and a 6-percent

discount for "stock sale costs".

To derive his recommended discount for tax on built-in

gains, Smith assumed that the value of C&L Bailey's assets would

be $4,160,177, after an assumed 5-year holding period, during

which he assumed the assets would grow at an annual rate of 2

percent.  He assumed selling expenses of 7 percent and estimated

that at the end of the assumed 5-year holding period the tax

basis of the assets would be $1,721,279, yielding an estimated

gain of $2,147,686, to which he applied an assumed combined

Federal and State tax rate of 39.06 percent, to yield an

estimated tax on potential gain of $838,886.  Smith concluded

[11] Ironically, petitioner criticizes the report of respondent's expert, Smith, for inappropriately relying on studies of publicly traded companies in arriving at his recommended 20-percent minority discount.

that this estimated potential gain had a present value of $613,552, after applying an assumed 8-percent discount rate. Comparing this estimated present value of tax with C&L Bailey's adjusted net asset value as of the date of decedent's death, Smith concluded that the appropriate rate of discount for tax on built-in gains was 21.44 percent.

Smith offered no explanation or support for any of the many assumptions that he utilized in the just-described analysis. Nor did he offer any explanation or support for his conclusion that the discount related to stock sale costs should be 6 percent. An expert report that is based on estimates and assumptions not supported by independent evidence or verification is of little probative value or assistance to the Court. See Rose v. Commissioner, 88 T.C. 386, 418 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Parker v. Commissioner, 86 T.C. 547, 561 (1986); see also Klapmeier v. Telecheck Intl., Inc., 482 F.2d 247, 252 (8th Cir. 1973). "The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based." Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998). Consequently, we find Smith's report unpersuasive in its determination of appropriate discounts for tax on built-in gains or stock sale costs. We deem respondent to have conceded, however, that a combined discount of at least 27.44-percent is appropriate with regard to these factors.

In his report, Smith also identified a number of other factors (apart from tax on built-in gains and stock sale costs) that he says are normally considered in calculating a marketability discount. For various reasons, however, he assigned no weight to any of these other factors. For instance, he assigned no weight to management continuity, because he believed that C&L Bailey was merely a "holding company". For a contrary viewpoint, we need look no further than Smith's own report. In the section of his report captioned "Company Background", Smith stated that C&L Bailey was founded for "the primary purpose of owning and operating motel properties" and that decedent's grown children managed the motels. Similarly, in the "Financial Analysis" section of his report, Smith stated that C&L Bailey "owns and operates two motels". From his report, we infer that Smith believes that management continuity would support an additional amount of marketability discount if C&L Bailey were considered to be an operating company. As just noted, Smith's own report (although internally inconsistent in this regard), as well as the evidence in the record, fairly supports a conclusion that C&L Bailey was in fact an operating company. Hence, Smith's own report supports a conclusion that his recommended marketability discount is understated insofar as it disregards continuity of management.

Accordingly, we believe that, after taking into account the parties' agreed-upon 20-percent minority discount and respondent's deemed concessions as to discounts for tax on built-in gains and stock costs, the appropriate combined valuation discount lies somewhere between the 52-percent combined discount suggested by Schwartz's recommendations and the 41.95-percent combined discount recommended by Smith. We conclude and hold that the appropriate combined valuation discount rate is 50 percent. In doing so, we give due regard to the fact that this is the same combined discount rate reflected on decedent's estate tax return, cf. Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989) (stock values reported on an estate tax return were an "admission" that could not be overcome "without cogent proof that the reported values were erroneous"), and to the fact that respondent, in his notice of deficiency, accepted this 50-percent combined discount rate and has not shown that a lower discount rate is appropriate, cf. Rule 142(a) (burden of proof is upon respondent as to any new matter pleaded in the answer).

In sum, we conclude and hold that the value of C&L Bailey's adjusted net assets at decedent's death was $2,861,903 (the calculations are detailed in Appendix A). Employing the adjusted net asset valuation method that the parties agree is appropriate in this case, and applying a 50-percent combined valuation discount, we conclude and hold that the date-of-death value of

decedent's 50 shares of C&L Bailey stock was $357,738 (see Appendix B).

B.  Valuation of QTIP Property

As previously discussed, the parties agree that the value of the 50 shares of C&L Bailey stock includable in decedent's gross estate pursuant to section 2044 and the value of the 50 shares of C&L Bailey stock that decedent owned outright are identical. Consequently, we hold that the 50 shares of C&L Bailey stock includable in decedent's gross estate pursuant to section 2044 have a value of $357,738.

C.  Unreported Taxable Gifts

The Promissory Note

In 1993, decedent transferred certain of his separate property, including the Lake Catherine property, into the grantor trust.  On January 31, 1994, the Manesses executed a $148,700 promissory note in favor of the grantor trust.  A year later, on January 31, 1995, after decedent had revoked the grantor trust, decedent and Melba executed a warranty deed conveying the Lake Catherine property to the Manesses.  On the same date, decedent and Melba executed an assignment of the promissory note to three of decedent's children.

Respondent contends that the assignment of the promissory note gave rise in 1995 to taxable gifts from decedent to three of his children in the full amount of the promissory note (less

$30,000, reflecting three $10,000 annual exclusions).  Petitioner argues that the promissory note was decedent's and Melba's joint property and appears to contend that the assignment should be regarded as gifts from decedent and Melba equally.

Respondent asserts that the promissory note was consideration to the grantor trust for its sale of the Lake Catherine property to the Manesses.  Petitioner counters that respondent's assertion is bald speculation.  Petitioner, however, has offered no other explanation for the promissory note's being made payable to the grantor trust.[12]  We believe that the evidence in the record fairly supports an inference that the promissory note was in fact consideration for the Lake Catherine property, which had been decedent's separate property before he placed it in the grantor trust.  Consequently, pursuant to the antenuptial agreement, Melba would have had no interest in either the Lake Catherine property or the promissory note, either before or after decedent's revocation of the grantor trust.  Accordingly, we conclude, as respondent has determined, that in assigning the promissory note to three of his children, decedent made three unreported taxable gifts totaling the face amount of

---

[12] On brief, petitioner makes various arguments predicated on a supposition that the promissory note was made payable to decedent and Melba jointly.  Petitioner has offered neither the promissory note nor any other evidence in support of this supposition.  The only evidence on this score is found in the assignment of the promissory note, which decedent and Melba executed on Jan. 31, 1995, and which states that the promissory note was "in favor of Lewis A. Bailey Family Trust".

the promissory note less $30,000 (to reflect three annual exclusions).[13]

Petitioner suggests vaguely that Melba might have acquired an interest in the promissory note, presumably after decedent's revocation of the grantor trust (since the grantor trust contained no provision whereby Melba might acquire any interest in any trust property) but before the assignment of the note to decedent's three children. There is no evidence in the record, however, to support this suggestion, which is undermined by the contemporariness of the transfers of the note out of the grantor trust and to decedent's three children, and by the antenuptial agreement between decedent and Melba, which states decedent's desire that his children should receive his separate property "unaffected by the marriage of the parties hereto".

Petitioner also suggests that Melba's joining in on the execution of the warranty deed conveying the Lake Catherine property to the Manesses and on the assignment of the note to three of decedent's children shows that she had an interest in the Lake Catherine property and the promissory note. We are unpersuaded by petitioner's argument. We believe it more likely that, pursuant to the terms of the antenuptial agreement, Melba signed these legal documents as a mere formality, without thereby

---

[13] Petitioner does not contend that the conditions of the gift-splitting provisions of sec. 2513 have been met here.

acquiring any interest in either the Lake Catherine property or the promissory note.

Accordingly, we sustain respondent's determination on this issue.

### Other Taxable Gifts

In the notice of deficiency, respondent determined, without explanation, that decedent made unreported taxable gifts of $20,000 and $10,000 in 1989 and 1993, respectively. On brief, respondent contends, with only slightly more specificity, that this determination is predicated on certain of decedent's gifts of C&L Bailey stock to Roger, Frances, and Lillian.

Petitioner concedes that decedent made gifts of C&L Bailey stock to Roger, Frances, and Lillian but contends they each received no more than two shares of C&L Bailey stock in any given year. The parties have stipulated that from 1989 through 1993, C&L Bailey redeemed 100 of its shares for $5,000 per share. Therefore, petitioner concludes, each share of stock that decedent gave away had a value of $5,000, so that his total annual gift to each donee was $10,000--an amount equal to the annual exclusion. Thus, petitioner concludes, decedent's gifts of C&L Bailey stock properly were not reported as taxable gifts.

Although petitioner's assumption of a $5,000 value for the stock shares in question seems questionable, respondent does not

appear to dispute it.[14]  Respondent disputes petitioner's premise, however, as to the number of C&L Bailey shares decedent gave to his relatives.  Respondent argues essentially that because decedent's stock holdings in C&L Bailey decreased from 150 shares to 50 shares between 1985 and 1993, he must have made gifts of two shares per year to at least five of his descendants for each of these 9 years.[15]  Leaving aside respondent's unsatisfactory math, which leaves 10 shares of stock unaccounted for, and leaving aside the fact that respondent's argument bears no discernible relationship to his determination in the notice of deficiency, we note that even these many alleged two-shares-at-a-time gifts of stock shares over 9 years would result in no

---

[14] To the contrary, in his opening brief, respondent appears to embrace the assumed $5,000-per-share value.  Respondent first refers to the parties' stipulations that decedent gave Roger, Lillian, and Frances two shares each of C&L Bailey stock, and that C&L Bailey redeemed these shares at $5,000 per share.  On the basis of these stipulations, respondent then asserts-- mistakenly--that petitioner has conceded the $30,000 increase in taxable gifts as determined in the notice of deficiency.  From this mistaken assertion, we infer that respondent reckons the $30,000 adjustment in the notice of deficiency as based on decedent's gifts of six shares of stock at a value of $5,000 each.

[15] Viewed charitably, there is some tension between respondent's argument and the following stipulation of the parties:

> 3.  Between the inception of C & L Bailey, Inc. and 1993, the Decedent gave certain shares of C & L Bailey, Inc. stock to his descendants, including gifts of two shares of C & L Bailey, Inc. stock to his son, Roger Bailey, two shares of C & L Bailey, Inc. stock to his daughter-in-law, Lillian Bailey, and two shares of C & L Bailey, Inc. stock to his daughter, Jeanette Foster.

taxable gifts if we accept the $5,000 per-share value that respondent does not appear to dispute.  Moreover, we are unimpressed with respondent's suggestion that the decrease in decedent's stockholdings can be explained only by supposing that decedent gave the shares away.  In light of the previously noted stipulation that C&L Bailey redeemed 100 shares of its stock from 1985 to 1993, it seems more plausible that C&L Bailey simply redeemed some of decedent's shares.

After due consideration of the limited evidence in the record, and bearing heavily against respondent, who has failed to show any meaningful basis for his determination in the notice of deficiency, we conclude and hold that respondent erred in determining that decedent had unreported taxable gifts of C&L Bailey stock in 1989 and 1993.[16]

D.  Administrative Expenses

Petitioner claims $47,522 of administrative expenses that were not claimed on the estate tax return.  Respondent has conceded all these claimed administrative expenses except for

---

[16] At trial, petitioner sought to raise new issues as to whether decedent's 1993 gift tax return erroneously reported a $28,147 taxable gift to Frances Jeanette Foster and as to whether decedent's 1989 gift tax return overstated amounts of gifts to Roger and Lillian Bailey.  We decline to consider these intrinsically factual issues raised for the first time at trial, since they were not properly pleaded and resulted in surprise and prejudice to respondent.  See Estate of Mandels v. Commissioner, 64 T.C. 61, 73 (1975); see also Rules 34(b)(4), 41(b).  In any event, the evidence in the record does not credibly establish petitioner's entitlement to the relief sought.

$10,500 of claimed expenses, consisting of: (1) $7,500 fees for legal services of Dan McCraw, a Hot Springs, Arkansas, attorney, and (2) $3,000 fees for legal services of George Plastiras, a Little Rock, Arkansas, attorney.[17] On the basis of all the evidence, we conclude that petitioner has adequately established that these disputed amounts were necessarily or reasonably incurred in the administration of the estate. Accordingly, we hold that the claimed $47,522 of postreturn administrative expenses is deductible from the value of the gross estate pursuant to section 2053(a).

To reflect the foregoing and the parties' concessions,

Decision will be

entered under Rule 155.

---

[17] Included in the $47,522 of postreturn administrative expenses that petitioner has claimed is $4,899.19 of fees paid to Joy Gibson (Gibson), a California attorney who handled the California probate of decedent's one-half ownership interest in parcel 2. Respondent concedes that "the expense of bringing the probate case to clear up title" should be deductible from the gross estate. Respondent does not dispute that the fees paid to Gibson were reasonably incurred for this purpose, but contends, without explanation, that the deductible amount is only $4,846.49. The parties have stipulated that the estate paid Gibson $4,899.19. We deem respondent to have conceded that $4,899.19 is deductible from the gross estate.

APPENDIX A

Net Asset Value of C&L Bailey

| | Estate Tax Return | Petitioner | Respondent | Holding |
|---|---|---|---|---|
| **Assets** | | | | |
| Arkansas Motel | [1]$2,400,730 | $2,380,000 | $2,380,000 | $2,380,000 |
| California Motel | 1,388,000 | 819,000 | 1,388,000 | 1,388,000 |
| Other assets | 430,198 | [2]-- | [3]202,252 | 202,252 |
| Total assets | $4,218,928 | $3,199,000 | $3,970,252 | $3,970,252 |
| **Liabilities** | | | | |
| Loans from stockholders | [4]-- | 145,000 | -- | -- |
| Other liabilities | [4]-- | 1,108,349 | 1,108,349 | 1,108,349 |
| Total liabilities | $1,253,266 | $1,253,349 | $1,108,349 | $1,108,349 |
| Net assets | $2,965,662 | $1,945,651 | $2,861,903 | $2,861,903 |

[1] The estate tax return includes a $20,730 addition to the value of the Arkansas motel described only as "Godbehere Appraisal." The record is silent as to what this amount represents. Neither party has included such a separate amount in their calculations, and we ignore it in our holding.

[2] On brief, petitioner omits from her net asset value calculations all assets other than the motels. Because petitioner has not otherwise disputed the existence or amounts of other assets as reported on the estate tax return, we assume that the omission was inadvertent and deem petitioner to have conceded the values of other assets in the lesser amounts determined by respondent.

[3] Respondent's $202,252 of other assets consists of $104,816 cash, $29,697 accounts receivable, $42,574 mortgage and real estate loans, and $25,165 other current assets. All these amounts are as reflected on C&L Bailey's Dec. 31, 1995, balance sheet. Respondent has excluded $19,000 franchise fees deposits and $16,316 loans to stockholders as shown on the corporate balance sheets.

[4] The estate tax return provides no detail as to the types of liabilities included in the net asset value calculation.

APPENDIX B

Calculation of Value of Decedent's 50 Shares C&L Bailey Stock

|  | Estate Tax Return | Petitioner | Respondent | Holding |
|---|---|---|---|---|
| Value of C&L Bailey's adjusted net assets | $2,965,662 | $1,945,651 | $2,861,903 | $2,861,903 |
| 25% ownership percentage | $741,416 | $486,413 | $715,476 | $715,476 |
| Combined valuation discount rate (percent) | 50 | [1]60 | 41.952 | 50 |
| Amount of discount | $370,708 | $291,848 | $300,157 | $357,738 |
| Discounted value of 50 shares | $370,708 | $194,565 | $415,319 | $357,738 |

[1] As indicated in note 10 of the opinion, on brief petitioner erroneously treats the 40-percent claimed minority discount and 20-percent agreed-upon minority discount as being additive rather than multiplicative.